No. 47,574

Gary Dean Gobin, *Appellant*, v. Globe Publishing Company, *Appellee.*

(531 P. 2d 76)

Opinion filed January 25, 1975.

*Donald E. Shultz,* of Shultz and Shultz, Chartered, of Dodge City, argued the cause, and *Robert M. Baker,* of Ashland, was with him on the brief for the appellant.

*Harry A. Waite,* of Minner and Waite, of Dodge City, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

Harman, C.: This is an action for damages for libel. The trial court entered summary judgment for the publisher and the plaintiff appeals.

The plaintiff, Gary Dean Gobin, on June 11, 1973, filed his petition alleging that the defendant, Globe Publishing Company, on or about July 6, 1972, published in its newspaper, The Dodge City Daily Globe, an article and certain accompanying photographs and captions which were false, libelous and defamatory to plaintiff. The petition requested $400,000 actual damages for loss of an auto-

mobile repair business and $100,000 exemplary damages for publishing the article without adequate investigation of the facts in reckless or malicious disregard of plaintiff's rights and reputation. Attached to plaintiff's petition was the publication in question, which stated:

"ANIMAL CRUELTY CASE REPORTED TO COUNTY ATTNY.

"A case of pig starvation has been discovered in Dodge City, county attorney John Fierro reported Friday.

"Gary Gobin, Hollywood Addn. pled guilty in Ford County Court July 6 to cruelty to animals.

"Anyone who knows of a case of animal cruelty in the city or county is asked to report it immediately to the county attorney's office, Fierro said.

"Probate Judge Camilla Haviland has ordered the Ford County extension agent to check the condition of the pigs. Gobin will be fined pending this report.

"The case was discovered after Pauline Unruh, animal welfare director, received a complaint about starving hogs. She found 40 head of pigs in neglected condition, and signed a complaint.

"The county court has instructed Mrs. Unruh to make frequent visits to check the condition of Gobin's pig pen Fierro said."

The three accompanying pictures portrayed hogs in an emaciated condition above these captions:

"STARVED PIG—This animal was found still alive when the picture was taken. It had to be shot by a sheriff's deputy.

"PIGS FIGHT FOR GRASS—The pigs here fight over a handful of grass thrown to them, showing their starved condition.

"NEGLECTED ANIMALS—These are seen in neglected condition, searching for food in the dirt."

Defendant Globe filed an answer admitting publication of the material complained of but asserting the news items was within its qualified privilege to publish matter involving open violations of law which justify police interference and matters regarding the commission of crime. Globe denied the publication was false or that it had acted maliciously.

Thereafter Globe moved for summary judgment on the basis of its qualified privilege in making the publication. At the hearing upon this motion the parties filed a written stipulation which provided:

"1. The Globe Publishing Company is a Kansas corporation which publishes the Dodge City Daily Globe at Dodge City, Kansas.

"2. The Globe Publishing Company published in the July 8, 1972, issue of the Dodge City Daily Globe, an article captioned 'Animal Cruelty Case Reported to County Attorney'. A true copy of such article is attached hereto, marked 'Exhibit A' and made a part hereof by reference.

"3.  The article was written by Susan E. Shaw, at that time a report[er] for the Dodge City Daily Globe.  The statements made in the article are based upon information provided to Susan E. Shaw by John E. Fierro, the county attorney of Ford County, Kansas.

"4.  At the time the article was published, Gary Dean Gobin was not acquainted with persons working at the Dodge City Daily Globe who had anything to do with the composition and publication of the article, and no one at the Globe was personally acquainted with Gary Dean Gobin.

"5.  There are no facts or circumstances known to either party involved in this action as to ill-will, between Gary Dean Gobin and the officers and employees of the Globe Publishing Company, except that Gary Dean Gobin now resents the publication of the article described above.

"The parties agree that the foregoing are recitals of facts to be considered by the court in ruling upon plaintiff's motion for summary judgment."

The parties further stipulated orally that the reporter, Susan Shaw, would testify in accord with a letter written by her December 2, 1973, to Globe's attorney in which she stated her recollection of events occurring in connection with the publication.  This letter stated:

"The first thing I remember was that John Drake ( then editor of the *Globe* ) told me that the county attorney had some information for a news item.  I can't remember whether Mr. Drake mentioned starving hogs, but he did tell me to go to the county attorney's office and get this news that he had.

"I went to the county attorney's office and John Fierro (the county attorney) gave me pictures of the hogs and information on the case.  I must have gone to the county attorney's office on Friday, July 7, because the story says that 'Fierro reported (the case) Friday,' and because the hearing was Thursday, July 6.

"I brought the information and pictures back to the newspaper office that same day (Friday) and gave the pictures to Mr. Drake.  I typed up the news item on the case, using the information as I had understood it from Mr. Fierro. I then turned the story in for publication.  I don't remember having anything more to do with it after that.  The story appeared in the paper the next day, which was Saturday, July 8.

"I do not mean to imply that the county attorney necessarily gave me incorrect information.  I don't know what happened.  Evidently I, or the county attorney, or someone made an error somewhere along the line.  I am very sorry this has happened.  I certainly did not mean to cause trouble for Mr. Gobin, the newspaper, the county attorney or anyone.  It is true that I did not know Mr. Gobin."

The parties also stipulated orally that Globe's general manager would testify none of Globe's officers or employees who had anything to do with the composition or publication of the starving hogs article knew plaintiff or bore any ill will or malice toward him and there was no express intention of anyone connected with Globe to harm plaintiff.  The parties agreed the trial court had all the facts

before it necessary for decision of the issue of liability as raised in the motion for summary judgment.

Although not explicitly reflected in the foregoing recital, the fact concededly is that plaintiff Gobin did not plead guilty to a charge of cruelty to animals as reported in the news article.

The trial court ruled there were no unresolved issues of fact in the case and it sustained Globe's motion for summary judgment.

Appellant Gobin contends the trial court erred in concluding the publication was privileged and not actionable, that any privilege is limited by the requirement it be fair, impartial and accurate, and further the court erred in not making a distinction between libels involving public officials and private citizens as prescribed by recent federal authority.

By way of preliminary we may note that in modern times the law of defamation has evolved primarily as a matter of determining and applying common law tort principles upon a background of the guaranties of free speech and free press contained in section 11 of the Kansas Bill of Rights and the first and fourteenth amendments to the federal constitution. It has been largely concerned with the issue of privileged communications. Certain communications are recognized as privileged and as such not within the rules imposing liability for defamation. "The defense of privilege is a matter of public policy in furtherance of the right of free speech. The underlying idea is that by reason of a public or social interest that is entitled to protection, immunity is granted from liability for defamation that otherwise would be actionable. Privilege does not destroy the actionable character of a defamatory communication, but is available only by way of defense." (50 Am. Jur. 2d, Libel and Slander, § 192, p. 695.) In *Stice v. Beacon Newspaper Corporation,* 185 Kan. 61, 340 P. 2d 396, 76 ALR 2d 687, this court discussed the defense as follows:

"The term 'privileged' as applied to a publication alleged to be libelous means simply that the circumstances under which the publication was made are such as to repel the legal inference or presumption of malice, and to place upon the plaintiff the burden of affirmatively pleading and proving its actual existence beyond the mere falsity of the charge. A privileged communication is often divided into two classes: absolute privilege, and conditional or qualified privilege. It has been held that absolute privilege is recognized as applying to cases in which the public service or the administration of justice requires complete immunity as in legislative, executive and judicial proceedings, the occasion for the immunity being not so much for those so engaged as for the promotion of the public welfare.

"Generally speaking, qualified privilege exists in a larger number of cases than does absolute privilege. A privileged publication is one made on an occasion which furnishes a prima facie legal excuse for making it unless some additional· facts are shown which alter the character of the publication. It comprehends communication made in good faith, without actual malice and with reasonable or probable grounds for believing them to be true. Briefly stated, a qualifiedly privileged publication is a defamatory publication made on what is called an occasion of privilege without actual malice, and as to such publications, there is no civil liability regardless whether the publication is libelous *per se* or libelous *per quod*. The fact that a publication is qualifiedly privileged does not change the actionable quality of the words published, although, as previously indicated, such a publication rebuts the inference or presumption of malice and falsity which would otherwise arise as a matter of law, still leaving, however, the party responsible if both falsehood and actual malice are affirmatively pleaded and proved; that is, actual malice is not inferred or presumed from the injurious character of a qualifiedly privileged communication, and the injured party must allege and prove that the statements were made with malice—actual evil-mindedness or specific intent to injure." (pp. 64-65.)

Here appellee relies on a qualified privilege stated in *Beyl v. Capper Publications, Inc.,* 180 Kan. 525, 305 P. 2d 817, as follows:

"In the public interest and dissemination of news, within good faith limitations of fair comment, a newspaper has a qualified privilege to publish matters in connection with the prosecution of inquiries regarding the commission of crime, even though the publication may reflect on the individuals involved and tend to bring them into public disrepute." (Sy. ¶ 1.)

The defamation plaintiff there appealed from an order sustaining a demurrer to his petition. The publication in question purported to be based on an interview by the defendant publisher with the attorney general of Kansas relative to the operations of an alleged grain theft ring. Much of the published article directly quoted the attorney general and the remainder summarized information given by that official. Malice was not charged against the publisher. The rule stated above, following the "fair comment" standard enunciated in the oft-quoted case of *Coleman v. MacLennan,* 78 Kan. 711, 98 Pac. 281, was applied in affirming the trial court's action; it was applied later in *Stice,* in which the complainant was a public official. The qualified privilege mentioned in both cases would, without more, seem to warrant the grant of summary judgment where, as here, the parties stipulated there was no evidence of ill will. Even though a statement complained of be false, if it is qualifiedly privileged, it must be made with malice before it is actionable (*Munsell v. Ideal Food Stores,* 208 Kan. 909, 920, 494 P. 2d 1063, 60 ALR 3d 1059). Additionally, where the facts are

not in dispute, the question whether a publication complained of is privileged is a question of law to be decided by the court (*Beyl v. Capper Publications, Inc.,* supra). Based upon the foregoing appellee argues the trial court correctly granted summary judgment. However, there is more and a distinction must be mentioned in our present case. The newspaper article in question stated appellant had pled guilty to a criminal charge in the Ford county court. Thus it purports to communicate the result of a judicial proceeding. By contrast *Beyl* and *Stice* involved communications made during the course of ongoing criminal investigations rather than reports of court proceedings.

Concededly reports of judicial proceedings are also considered privileged but traditionally a separate, more strict rule has obtained as to them in recognizing a qualified privilege. In 53 CJS, Libel and Slander, § 127, these statements appear:

"The recognition of the right to publish proceedings of the courts of justice is of modern growth. Both at common law, and, in most jurisdictions, by force of statute a full, fair, *accurate,* and impartial report of a judicial proceeding is qualifiedly privileged, or such report of a judicial proceeding is absolutely privileged. . . . [pp. 204-205]

"The publication, to be privileged, must contain only that which happened in the due course of the proceedings, and any matter added thereto by the publisher defamatory of plaintiff is not privileged. The report must present fully, fairly, and *accurately* an impartial account of the proceedings. . . . [p. 205]

". . . *The privilege does not extend to protect comments that are unwarranted by the facts shown at the proceeding;* and a report of anything said or done at the time and place of the proceeding which was not a part thereof, or the publication of any statement by a newspaper made on its own authority and not purporting to be a report of a judicial proceeding, is not privileged." (p. 206.) (Emphasis supplied.)

In an annotation entitled "Libel and slander: garbled, inaccurate, or mistaken report of judicial proceedings as within privilege", at 120 ALR 1236, this rule is stated:

"The rule is well established that while impartial and accurate reports of judicial proceedings are qualifiedly privileged this privilege does not extend to unfair or inaccurate reports. . . . [p. 1236]

"And this is true although the inaccuracy in the publication is unintentional and the result of mistake." (p. 1237.)

Our own case of *Stone v. Hutchinson Daily News,* 125 Kan. 715, 266 Pac. 78, is in accord with the foregoing. There an affidavit to obtain a search warrant filed in justice of the peace court was the basis of an allegedly libelous publication. The published report did

not follow the language of the affidavit. In considering whether the publication was qualifiedly privileged this court held:

"The publication in a newspaper of an article based upon an affidavit filed in a search and seizure action, showing, among other things, who took the property and the arrangement with the owners for the taking of it, is qualifiedly privileged, even if the affidavit be false, provided the article be fair, honest and reasonably accurate and not disproportionate, exaggerated or sensational." (Syl. ¶ 3.)

In Prosser, Torts (4th ed., 1971) § 118, we find these statements:

"Obviously swept up and included under the Constitution as a part of the general heading of 'news' is the common law privilege of reporting on public proceedings. Since it is clearly to the interest of the public that information be made available as to what takes place in public affairs, the qualified privilege was recognized, under which a newspaper or anyone else might make such a report to the public. The privilege rests upon the idea that any member of the public, if he were present, might see and hear for himself, so that the reporter is merely a substitute for the public eye—this, together with the obvious public interest in having public affairs made known to all. [p. 830]

". . . But it has always been held that the report must be a fair and accurate one, and the privilege did not cover false statements of fact as to what has occurred, or mistakes in the names of parties, or the interpolation of defamatory matter, or a one-sided account. Neither did it include garbled or partial reports, although it was obviously not essential that the proceedings be set forth verbatim, and a summary of substantial accuracy was enough." (p. 832.)

And in Restatement, Torts, Second, § 611, Tentative Draft No. 20, April 25, 1974, this statement appears:

"REPORTS OF OFFICIAL PROCEEDINGS AND PUBLIC MEETINGS

"Defamatory matter concerning another in a report of any official proceeding or any meeting open to the public which deals with matters of public concern is published on a conditionally privileged occasion if the report is

"(a) accurate and complete, or a fair abridgement of what has occurred, and

"(b) published for the purpose of informing the public as to a matter of public concern." (p. 253.)

Reasons given for making a distinction in the law of libel applicable to reporting of judicial proceedings have included the fact judicial proceedings are peculiarly susceptible to exact reporting; an account of that which transpired at trial is not contingent upon fallible or futile modes of investigation; court records are available and insofar as reports of in-progress proceedings are concerned, the threat of libel emanates only from incompetent reporting; moreover, because those participating in judicial proceedings enjoy an

absolute immunity from suit for defamation, instances of defamation perpetrated by trial participants might well be compounded if reports of the proceedings enjoyed too protective a privilege (see *Jones v. Commercial Printing Co.*, 249 Ark. 952, 463 S. W. 2d 92).

Next we need notice the impact of recent decisions of the United States Supreme Court commencing in 1964 with *New York Times Co. v. Sullivan*, 376 U. S. 254, 11 L. ed 2d 686, 84 S. Ct. 710, 95 ALR 2d 1412. There it was held that the federal constitutional guaranty of freedom of speech and press, imposed on the states through the first and fourteenth amendments, prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with actual malice, that is, with knowledge it was false or with reckless disregard of whether it was false or not; that a defense of fair comment must be afforded for honest expression of opinion based upon privileged, as well as true, statements of fact, both defenses being defeasible if the public official proves actual malice; and that the constitutional guaranty of freedom of speech and press precludes an otherwise impersonal attack upon governmental operations being treated as a libel of an official responsible for these operations. This is in accord with prior Kansas law where accurate reports of judicial proceedings are not involved, notably *Coleman v. MacLennan*, supra, cited approvingly in *New York Times*.

In 1967 the *New York Times* standard was extended to voluntary public figures who were not public officials (*Curtis Publishing Co. v. Butts*, 388 U. S. 130, 18 L. ed. 2d 1094, 87 S. Ct. 1975, reh. den. 389 U. S. 889, 19 L. ed. 2d 197, 88 S. Ct. 11). And in 1971 the federal supreme court in a plurality decision seemed to extend the protection of the *New York Times* rule to defamatory statements relating to private persons where the statements concerned matters of general or public interest (*Rosenbloom v. Metromedia*, 403 U. S. 29, 29 L. ed. 2d 296, 91 S. Ct. 1811). Also in 1971 the same court decided *Time Inc. v. Pape*, 401 U. S. 279, 28 L. ed. 2d 45, 91 S. Ct. 633, reh. den. 401 U. S. 1015, 28 L. ed. 2d 552, 91 S. Ct. 1248, a decision thought by Professor Prosser to extend the *New York Times* standard to reporting of court proceedings even if the report is inaccurate (Prosser, Torts, 4th ed., 1971, § 118, p. 832, footnote 64a.)—a view not shared by other writers on the subject (see Johnson, "Libel: The *New York Times* Standard in Reports of Judicial Proceedings", 25 Sw. L. J. 800, 803, footnote 30).

We need not struggle with the perplexities posed by these latter two decisions in view of a more recent one, *Gertz v. Welch*, _____ U. S. _____, 41 L. ed. 2d 789, 94 S. Ct. 2997, decided June 25, 1974. There in a diversity action the person defamed was a lawyer who had been engaged in civil litigation against a convicted murderer. No factual basis existed for much of the defamatory matter published about him by the defendant, an organ of the John Birch Society. The trial court initially denied the defendant's motion for summary judgment based on the public interest test expressed in *Rosenbloom*. It submitted to the jury only the issue of plaintiff's damage. Later the trial court reversed itself and entered judgment for the defendant publisher notwithstanding the verdict. The court of appeals affirmed on the basis of *Rosenbloom*. After ruling that plaintiff's past conduct or his part in the particular controversy made him neither a public official nor public figure, the supreme court reversed and laid down broad general rules in its balancing of the competing interests in the law of libel—the need for a free and vigorous expression of first amendment freedoms and the state's limited but legitimate interest in providing a remedy for defamatory falsehoods. These rules were announced: A publisher or broadcaster of defamatory falsehoods about an individual who is neither a public official nor a public figure may not claim the *New York Times* protection against liability for defamation on the ground the defamatory statements concern an issue of public or general interest; so long as they do not impose liability without fault, the states may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood which injures a private individual and whose substance makes substantial danger to reputation apparent; the states, however, may not permit recovery of presumed or punitive damages when liability is not based on knowledge of falsity or reckless disregard for the truth, and the private defamation plaintiff who establishes liability under a less demanding standard than the *New York Times* test may recover compensation only for actual injury.

Thus, under *Gertz*, our old rule of strict liability applicable to reporting judicial proceedings which permitted recovery on no more proof than that the report was inaccurate, expressed in *Stone v. Hutchinson Daily News*, supra, is no longer constitutionally valid nor must the private citizen who is the subject of defamatory publication, even though the statement concerns an issue of public or

general interest, be required to meet the *New York Times* standard of actual malice. The question remains as to the standards of liability for injurious defamatory falsehood about private individuals which best serve the wants and needs of our citizenry under the particular circumstances here.

Traditionally, as has been emphasized, a higher standard for reporting judicial proceedings has been required in Kansas, and elsewhere, than for other communications, for reasons already mentioned. Beyond this, persons are generally held accountable for their negligence—the lack of ordinary care either in the doing of an act or in the failure to do something. The whole theory of negligence presupposes some uniform standard of behavior for the protection of others from harm. The norm usually is the conduct of the reasonably careful person under the circumstances. Thus ordinary negligence connotes a degree of fault, as that term is generally understood. The mentally competent person, of whatever calling or station, is usually held accountable under that standard. There have been exceptions, of course, some of which no longer exist as in the guest-host motor vehicle relationship, but as stated in *Henry v. Bauder,* 213 Kan. 751, 518 P. 2d 362: ". . . in a free society a citizen should be responsible for his tortious acts which injure the person or property of others." (p. 755.) That the Kansas founding fathers were concerned with preserving a remedy for libel is evident in their provision in section 11 of our Bill of Rights that the liberty of the press shall be inviolate and all persons may freely speak, write or publish their sentiments on all subjects, *being responsible for the abuse of such rights,* and their further proviso in section 18 that all persons, for injuries suffered in person, *reputation* or property, shall have remedy by due course of law. This latter places injury to reputation on the same plane as that to person or property which have always enjoyed protection from negligence.

In reporting judicial proceedings the communication media today can have, as well they should, considerable impact on the life of the individual citizen. There is no reason they should not be accountable for their negligence in the exercise of that function in the same manner as others are in carrying on their affairs. We see little or no societal interest in protecting carelessness in reporting judicial proceedings at the expense of truth in matters potentially defamatory on their face. The damage done by negligent reporting of such court proceedings can be just as devastating to the individual as that resulting from false reporting done maliciously or in reckless

disregard of truth and there should be no adverse effect on the first amendment freedoms in supplying a remedy for it—that available under ordinary rules of simple negligence. As said in *Gertz:*

". . . there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues. *New York Times Co. v. Sullivan,* 376 U. S., at 270. They belong to that category of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' (*Chaplinsky v. New Hampshire,* 315 U. S. 568, 572 [1942])." (_____ U. S. _____, 41 L. ed. 805, 94 S. Ct. 3007.)

Requiring the news media to use due care in gathering and reporting court proceedings where substantial danger to reputation is apparent from the published material should not prove onerous. Our holding then is, in reporting judicial proceedings a publisher or broadcaster of defamatory falsehoods about an individual who is neither a public official nor a public figure is liable in damages for actual injury to the individual when the assertion of the falsehood is the result of the publisher's or broadcaster's negligence and when the substance of the assertion makes substantial danger to reputation apparent; the standard to be applied in determining such negligence is the conduct of the reasonably careful publisher or broadcaster in the community or in similar communities under the existing circumstances; further, when liability for defamation is based solely upon negligence the plaintiff may not recover presumed or punitive damages.

Under these rules, since appellant was neither public official nor voluntary public figure and the publication was one the substance of which made substantial danger to reputation apparent, rendition of summary judgment was premature and remand must be ordered to make the relevant inquiry whether appellee Globe negligently published the false statement. The parties, of course, did not prepare this case for trial in terms of negligence. The little in the record pertinent to the issue of the reporter's negligence is ambiguous so as to make the matter of appellee's liability under the doctrine of *respondeat superior* not presently determinable. The parties stipulated as they did prior to the change in the law rendered by *Gertz,* the appellant relying for recovery on the inaccurate reporting of judicial proceedings rule laid down in *Stone v. Hutchinson Daily*

*News,* supra, and other precedent, while appellee relied on the *New York Times* standard.

The judgment is reversed and the cause remanded for further proceedings in accordance with the views herein expressed.

APPROVED BY THE COURT.

KAUL, J., dissents.