(596 P 2d 832)

No. 49,153

MICHAEL ALBERT BELLUOMO, MARY PAULA BELLUOMO, LOUIS DALE SCOTT and LUCY JOAN SCOTT, *Appellants and Cross-Appellees,* v. KAKE TV & RADIO, INC., *Appellee and Cross-Appellant.*

Petition for review denied September 14, 1979.

Opinion filed June 22, 1979.

*Jacob S. Graybill* and *Robert R. Arnold,* of Wichita, for appellants and cross-appellees.

*Floyd E. Jensen* and *Charles E. Jones,* of Adams, Jones, Robinson and Malone, Chartered, and *Norman I. Cooley,* of McDonald, Tinker, Skaer, Quinn & Herrington, of Wichita, for appellee and cross-appellant.

Before ABBOTT, P.J., REES and SWINEHART, JJ.

REES, J.: Plaintiffs are owners in partnership of a Wichita restaurant, Doc's Steak House. Defendant owns and operates a Wichita television station. Plaintiffs claim defendant wrongfully obtained certain audio-visual material and its subsequent broadcast resulted in injury for which plaintiffs seek recovery of compensatory and punitive damages. The case was tried to a jury. Its verdict was in favor of defendant. Plaintiffs appeal. We affirm.

The issues on appeal as stated by plaintiffs almost wholly concern evidentiary questions. In our view there are other issues. It is important that we speak of certain substantive issues because of limited Kansas and other authority and the collision of protected interests.

In 1973, defendant's news department undertook and executed an investigative reporting project. The result was a series of televised reports entitled "Let's Eat Out!" The series, consisting of approximately thirty-three segments, was broadcast as a part of defendant's news programming. Only one segment was broadcast on a single day; it was a part of each of defendant's three principal news programs that day; no segment was repeated on another day. Specifically involved in the case before us is the segment concerning Doc's Steak House broadcast on August 28, 1973.

On July 30, 1973, two of defendant's newsmen, Richard Cottam and Charles Duncan, accompanied a State Food Service and Lodging Board inspector, John Moshier, to plaintiffs' place of business. They met plaintiff Michael Belluomo. Introductions were made. A conversation ensued. The particular statements of the participants were the subject of substantially conflicting testimony.

The gist of defendant's evidence as to what was said and transpired is reflected by the following testimony of Cottam:

"A. [We said] [t]he same thing that we told everyone else in every inspection trip we made, that we were from KAKE news, that we were preparing a series on the restaurant inspectors and their inspections and we wondered if we might accompany Mr. Moshier on his inspection at Doc's. As I recall, Mr. Belluomo asked some questions about this as most of them did and we answered those

questions. He agreed that we could accompany him. We then asked if we might shoot film of the inspector at his inspection.

"Q. You say we, did you do that or did Mr. Duncan do that?

"A. I think Duncan requested permission to shoot film and it was almost always stated the same way, could we shoot film of the inspector during his inspection and the results of his inspection, and Mr. Belluomo agreed that we could. We then—I then produced the release form and asked him to sign it, explaining that we had to have a signed release before we could shoot film, and he then signed it."

The written "consent" presented by Cottam and Duncan and signed by Belluomo is a somewhat imperfect modification of a form utilized by defendant for another purpose. Plaintiffs' contention, based upon other evidence concerning the conversation and other matters, is that Belluomo was fraudulently induced to grant permission to enter into and photograph the nonpublic area of the restaurant. We will not reiterate this other evidence but it was quite sufficient to support plaintiffs' contention.

Cottam and Duncan, using a silent camera, one that did not record sound, took motion pictures of conditions in the food handling, preparation and serving areas of the restaurant and departed the premises with the inspector after his inspection. No pictures of the dining and other public areas were taken.

On the following day, July 31, 1973, plaintiff Louis Scott gave written notice of the partnership's revocation of the consent previously granted by Belluomo. Defendant argues a pretrial ruling, that the July 30 consent was revocable and was revoked on July 31, was erroneous for the reason that Scott stated in his notice that Belluomo exceeded his authority to act on behalf of the partnership and the plaintiffs' written partnership agreement fails to limit a single partner's power to act for the partnership. Defendant's argument does not wash. Defendant relies upon gratuitous consent granted by one partner but denies the power of one partner to terminate or revoke that consent. Defendant cannot have it one way and not the other. Scott's notice effected revocation of the consent granted by Belluomo; the reason given by Scott is of no consequence. *Garden v. Parfumerie Rigaud, Inc.*, 151 Misc. 692, 271 N.Y.S. 187 (1933), held gratuitous consent to the use of one's name and portrait is revocable at any time.

The first segment of defendant's series was broadcast on August 6, 1973. It was in the nature of an introductory chapter.[1] The broadcast concerning Doc's Steak House was aired twenty-nine days after the news team's visit. Moshier testified at trial that "approximately thirty days" after that visit, reinspection of the

1. Excluding a presently immaterial edited interview with the then director of the Wichita-Sedgwick County Community Health Department, the video display was of Duncan and a neutral background and the audio broadcast was the following statement read by Duncan:

"When you or I buy milk at the grocery store . . . or a prescription at the drug store, we take for granted that the product is clean and safe.

"Most of us carry over this same belief in other areas . . . we assume that if a product is on the market, or if the service is licensed by some regulatory agency . . . it's acceptable.

"Most of us know for example, that restaurants are checked by health inspectors, or environmentalists.

"So, if a restaurant is open, it must be clean. Unfortunately, that's not necessarily the case. Every establishment that sells food to the public is inspected, both by the city county health department personnel and by inspectors of the state food service and lodging board with both agencies issuing operating permits or licenses. And both give demerit scores based on a standard inspection form. But as a general rule, the public knows nothing about that inspection score and probably doesn't know that the form is available for public inspection. And too often, the inspection score indicates the facilities have problems meeting minimum health standards, some of the problems are very serious. Such items as inadequate cleaning and sanitizing of dishes and silverware . . . unsafe food refrigeration . . . or, storage . . . or unclean food preparation or food handling. Yet, the restaurant is still open . . . still serving the public.

. . . .

"For the next five or six weeks . . . perhaps longer . . . we will present reports five days a week on some of the inspections.

"It's important to point out we purposely selected only those establishments that both the public records and the health inspectors indicated had a history of poor ratings.

"We considered showing a cross-section of all restaurants, but were concerned that the good establishments . . . and that's the vast majority . . . might be confused in the minds of some with those places with poor and bad ratings.

"And we repeat, the great majority of eating places in this area are rated from excellent to acceptable . . . with perhaps 10 to 30 percent of all restaurants termed bad, by health officials.

"Our research into the files of the 800 or so restaurants in Sedgwick County seems to confirm that estimate.

. . . .

"Beginning tomorrow KAKE news will examine specific restaurants as they were checked by health department and state inspectors. The series will be carried on radio and television five days a week for the next five or six weeks. Tomorrow, a downtown restaurant."

restaurant resulted in the assessment of seven demerits. Consideration of the implications of these latter facts and understanding of the contentions of the parties is assisted by the following fair, if not precise, description of the August 28 broadcast:

Duncan opens program in studio with background shot of Doc's Steak House.

Duncan: "We were given written permission by the owner of Doc's Steak House, 1515 North Broadway, to accompany State Food Service and Lodging Inspector John Moshier and to film results of his inspection.

[At this point video is of restaurant exterior.]

Inspector Moshier found violations which resulted in 37 demerits being assessed Doc's Steak House. That is 18 above what the Food Service and Lodging Board consider adequate operation.

[At this point video is of kitchen area showing the subjects of the following audio description.]

Bread was being stored open and in a cardboard container with no protection. A dirt buildup was found in a cooler in the back room. The dishwasher was 10° short of reaching the minimum required temperature for proper sanitizing. Inspector Moshier also found rusty shelves in the walkin cooler, unclean shelves with food stored below and a dust-caked grid on a fan directly above clean lettuce. Also cited were a dirty cutting board, an unclean tray for clean silverware and no hair restraint on one waitress. And in the basement large openings were cited as potential problem areas."

Moshier: "There was quite a number of wide openings in a number of areas in the basement area in addition to openings in between the floor joists which made it a potentially considerable access of entry of rats and mice and vermin and etc."

Duncan: "What is the indication of the large buildup of grease under the stove?

Moshier: "A buildup of grease under the stove indicates it is not getting a daily cleaning. It is just one problem of management not getting the people to do the work."

[Video showing Moshier inspecting glasses, areas where grease could build up and food in the open.]

Duncan: "Inspector Moshier pointed out some positive aspects of Doc's Steak House including clean areas in the dining room and the fact that management had plans to perform some remodeling in the kitchen which should eliminate some of the violations."

[Video shows closeup of Moshier at another location with neutral background.]

Moshier: "Doc's Steak House was in considerable violation in that a 37 demerit inspection indicates prompt action either on the part of the operator or enforcement orders written. At this date we are attempting to correct these things by the cooperation of the management and there will be another reevaluation done in 30 days and in fact if there is not considerable correction made an enforcement order will be written."

Duncan: "What does an enforcement order mean?

Moshier: "Enforcement order is for the allowance of a set length of time for the corrections to be made and in the event the corrections are not made then we will seek the services of the district attorney for prosecution."

[Video of Duncan in studio.]
Duncan: "The 30 days before another valuation will be made will be up at the end of this month."

By its cross-appeal, defendant claims absolute protection under the First Amendment constitutional guaranty of freedom of speech and press. The principal case authority relied upon is *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L.Ed.2d 686, 84 S.Ct. 710 (1964).

In *New York Times,* it was held the constitutional guaranty prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless it is proved the statement was made with knowledge that it was false or with reckless disregard of whether it was false or not. 376 U.S. at 279-280. This constitutional protection was extended to defamatory falsehoods relating to voluntary public figures who were not public officials in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 18 L.Ed.2d 1094, 87 S.Ct. 1975, *rehearing denied* 389 U.S. 889 (1967). These decisions were followed by *Time, Inc. v. Pape,* 401 U.S. 279, 28 L.Ed.2d 45, 91 S.Ct. 633, *rehearing denied* 401 U.S. 1015 (1971); *Rosenbloom v. Metromedia,* 403 U.S. 29, 29 L.Ed.2d 296, 91 S.Ct. 1811 (1971); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 41 L.Ed.2d 789, 94 S.Ct. 2997 (1974). In commenting upon *Gertz,* a defamation action, it was aptly stated in *Gobin v. Globe Publishing Co.,* 216 Kan. 223, 231, 531 P.2d 76 (1975), that:

"These rules were announced: A publisher or broadcaster of defamatory falsehoods about an individual who is neither a public official nor a public figure may not claim the *New York Times* protection against liability for defamation on the ground the defamatory statements concern an issue of public or general interest; so long as they do not impose liability without fault, the states may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood which injures a private individual and whose substance makes substantial danger to reputation apparent; the states, however, may not permit recovery of presumed punitive damages when liability is not based on knowledge of falsity or reckless disregard for the truth, and the private defamation plaintiff who establishes liability under a less demanding standard than the *New York Times* test may recover compensation only for actual injury."

*New York Times* and its progeny have most recently been reviewed and commented upon in *Herbert v. Lando,* 441 U.S. 153, 60 L.Ed.2d 115, 99 S.Ct. 1635 (1979). Two observations concerning *Herbert* deserve mention. It is a civil libel action brought by an admitted public figure against representatives of

the news media. The particular practical issue before the court was the scope of discovery. Included in the majority opinion are the following statements:

"Civil and criminal liability for defamation was well established in the common law when the First Amendment was adopted, and there is no indication that the Framers intended to abolish such liability. Until *New York Times* the prevailing jurisprudence was that '[l]ibelous utterances [are not] within the area of constitutionally protected speech . . . .' *Beauharnais v. Illinois,* 343 U.S. 250, 266 (1952); see also *Roth v. United States,* 354 U.S. 476, 482-483 (1957); *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571-572 (1942); *Near v. Minnesota,* 283 U.S. 697, 707-708 (1931). The accepted view was that neither civil nor criminal liability for defamatory publications abridge freedom of speech or freedom of the press, and a majority of jurisdictions made publishers liable civilly for their defamatory publications regardless of their intent. *New York Times* and *Butts* effected major changes in the standards applicable to civil libel actions. Under these cases public officials and public figures who sue for defamation must prove knowing or reckless falsehood in order to establish liability. Later, in *Gertz v. Robert Welch, Inc.* [418 U.S. 323], the Court held that nonpublic figures must demonstrate some fault on the defendant's part and, at least where knowledge or reckless untruth is not shown, some proof of actual injury to the plaintiff before liability may be imposed and damages awarded." 441 U.S. at 158.

"[I]n the 15 years since *New York Times,* the doctrine announced by that case, which represented a major development and which was widely perceived as essentially protective of press freedoms, has been repeatedly affirmed as the appropriate First Amendment standard applicable in libel actions brought by public officials and public figures. *Curtis Publishing Co. v. Butts* [388 U.S. 130]; *St. Amant v. Thompson* [390 U.S. 727]; *Gertz v. Robert Welch, Inc.* [418 U.S. 323]; *Time, Inc. v. Firestone,* 424 U.S. 448 (1976). At the same time, however, the Court has reiterated its conviction—reflected in the laws of defamation of all of the States—that the individual's interest in his reputation is also a basic concern. *Time, Inc. v. Firestone, supra,* at 455-457; *Gertz v. Robert Welch, Inc.,* 418 U.S., at 348-349." 441 U.S. at 169.

"Spreading false information in and of itself carries no First Amendment credentials. '[T]here is no constitutional value in false statements of fact.' *Gertz v. Robert Welch, Inc.,* 418 U.S., at 340.

"Realistically, however, some error is inevitable; and the difficulties of separating fact from fiction convinced the Court in *New York Times, Butts, Gertz,* and similar cases to limit liability to instances where some degree of culpability is present in order to eliminate the risk of undue self-censorship and the suppression of truthful material. Those who publish defamatory falsehoods with the requisite culpability, however, are subject to liability, the aim being not only to compensate for injury but also to deter publication of unprotected material threatening injury to individual reputation." 441 U.S. at 171.

"Although defamation litigation, including suits against the press, is an ancient phenomenon, it is true that our cases from *New York Times* to *Gertz* have considerably changed the profile of such cases. In years gone by, plaintiffs made out a prima facie case by proving the damaging publication. Truth and privilege

were defenses. Intent, motive and malice were not necessarily involved except to counter qualified privilege or to prove exemplary damages. The plaintiff's burden is now considerably expanded. In every or almost every case, the plaintiff must focus on the editorial process and prove a false publication attended by some degree of culpability on the part of the publisher." 441 U.S. at 175.

*New York Times* and its successors concern defamation—libel and slander—claims. They recognize an individual's interest in his reputation is a basic concern. They afford defendant no protection here.

The theory upon which plaintiffs' claim was submitted to the jury was tortious conduct, trespass, in defendant's news gathering, not defamatory falsehood. Plaintiffs contend the August 28 broadcast was the fruit of the July 30 filming in and of the nonpublic area of plaintiffs' place of business and because the consent granted for such activity on that day was fraudulently obtained, defendant was guilty of civil trespass. Plaintiffs assert entitlement to recovery of compensatory damages upon evidence of diminution of customer patronage and sales following the broadcast date and punitive damages upon evidence that fraudulent representation by defendant's newsmen induced Belluomo's grant of consent. The jury was instructed in accord with these contentions.[2]

---

2. The trial court instructed the jury in part as follows:

"Plaintiffs . . . claim that they were damaged and suffered loss as the result of defendant's . . . fraudulent entry upon their premises and as the result of a film made in connection with defendant's alleged wrongful entry which was subsequently broadcast and televised by defendant.

"The burden of proof is upon plaintiffs to prove by clear and convincing evidence that defendant's entry upon plaintiffs' premises was obtained by fraud and that the film which was broadcast and televised by defendant was the direct cause of loss and damage to plaintiffs.

. . . .

"If you find by clear and convincing evidence that plaintiffs have met the burden of proof that defendant gained entry upon plaintiffs' premises and secured film of plaintiffs' premises by fraudulent means and that the broadcasting of the film caused plaintiffs' loss and damage, then you should return a verdict in favor of plaintiffs.

"If, on the other hand, you find that the entry onto plaintiffs' premises and the film taken on plaintiffs' premises were not secured by fraudulent means or that the broadcasting of the film was not the direct cause of loss or damage to plaintiffs, then your verdict should be in favor of the defendant."

That the broadcast afforded a viewer anything other than an unflattering impression of plaintiffs' business strains likelihood. None of the "positive aspects of Doc's Steak House" were a part of the video broadcast. There was sufficient competent evidence upon which to award compensatory and punitive damages had the jury so decided.

Whether defendant was liable upon proof of damages resulting from tortious conduct, trespass, in its news gathering is the underlying substantive issue in this litigation.

In a similar case, the following is said regarding trespass:

"Historically, trespass has its roots in the criminal law. However, as the law developed it became also recognized as a tort, compensible in damages. Thus, at common law, every entry upon the land of another, except by consent, was a trespass for which satisfaction in damages would lie. . . . [O]ne found guilty of a civil trespass responds in damages to the injured party.

"In an action for civil trespass the plaintiff is always entitled to at least nominal damages, and all damages of which the act of trespass was the efficient cause and for which the plaintiff is entitled to recover in any form may be recovered in such action although in point of time they did not result until sometime after the act was committed.

"Consent is, of course, an absolute defense to an action for trespass provided the consent is given by the possessor of the land or one competent and authorized to give such consent and provided further that the acts of the party accused of the trespass do not exceed, or are not in conflict with, the purposes for which such consent was given." *Fletcher v. Florida Publishing Company*, 319 So.2d 100, 104 (Fla. App. 1975).

See also *Mackey v. Board of County Commissioners*, 185 Kan. 139, 147, 341 P.2d 1050 (1959).

*Galella v. Onassis*, 487 F.2d 986 (2nd Cir. 1973), was an action brought by a free-lance photographer, an American paparazzo, against the widow of the late President John F. Kennedy and three secret service agents for false arrest, malicious prosecution and interference with trade. His claims were denied and Mrs. Onassis was granted injunctive relief on her counterclaim. In the opinion it is said:

"Galella does not seriously dispute the court's finding of tortious conduct. Rather he sets up the First Amendment as a wall of immunity protecting newsmen from any liability for their conduct while gathering news. There is no such scope to the First Amendment right. Crimes and torts committed in news gathering are not protected. *See* Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); Rosenbloom v. Metromedia, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); Dietemann v. Time, Inc., 449 F.2d 245, 249-250 (9th Cir. 1971). *See*

Restatement of Torts 2d § 652(f), comment k (Tent. Draft No. 13, 1967). There is no threat to a free press in requiring its agents to act within the law." 487 F.2d at 995-996.

*Dietemann v. Time, Inc.,* 449 F.2d 245 (9th Cir. 1971), was an intrusion upon seclusion case (*cf. Froelich v. Adair,* 213 Kan. 357, 516 P.2d 993 [1973]) in which:

"[T]wo reporters gained entrance to the home of the plaintiff by subterfuge, and took pictures with a hidden camera and recorded conversations by means of a hidden microphone. The Court held that the later publication of some of the pictures and printed matter based on the recordings did not immunize the publisher from responding in damages for the intrusion. The Court found that the invasion of privacy consisted of the clandestine photography and recording and that 'publication is not an essential element of plaintiff's cause of action.'" *Cantrell v. Forest City Publishing Co.,* 484 F.2d 150, 155 (6th Cir. 1973).

Of the cases reviewed in our research, the one most analogous to that before us is *Le Mistral v. CBS,* 61 App. Div. 2d 491, 402 N.Y.S.2d 815 (1978). The facts and holdings are best recited by quoting from the opinion:

"Defendant Columbia Broadcasting System in its capacity as owner and operator of Television Channel 2 in New York, on July 6, 1972, directed defendant Lucille Rich, its employee, and a camera crew to visit a number of restaurants which had been cited for health code violations by the Health Services Administration of New York City. Plaintiff restaurant was on the list. The camera crew and Ms. Rich entered the restaurant at approximately 2:00 p.m. with the camera working ('rolling'), which necessitated the utilization of bright lights for filming purposes. After entering the premises in this fashion, Ms. Rich and the camera crew were commanded to leave by plaintiff's president. It appears that these CBS employees were on the premises for a period of time during which the camera continued to roll. Plaintiff, insofar as its action for *trespass* is concerned, was awarded compensatory and punitive damages by a jury. The trial court on defendant CBS's motion upheld the jury verdict in finding that the conduct of this defendant constituted a *trespass,* but set aside the damage awards.

"Initially, we are confronted with defendant CBS's claim that despite the tort committed, defendant is insulated from any damage award by virtue of the First Amendment to the United States Constitution. Clearly, the First Amendment is not a shibboleth before which all other rights must succumb. This Court 'recognizes that the exercise of the right of free speech and free press demands and even mandates the observance of the coequal duty not to abuse such right, but to utilize it with right reason and dignity. Vain lip service to "duties" in a vacuous reality wherein "rights" exist, sovereign and independent of any balancing moral or social factor creates a semantical mockery of the very foundation of our laws and legal system' (*Bavarian Motor Works v. Manchester,* 61 Misc.2d 309, 311 [305 N.Y.S.2d 593, 596]). In *Dietemann v. Time, Inc.* (449 F.2d 245, 249 [9th Cir. 1971]), it was observed that '*(t)he First Amendment has never been construed to*

accord newsmen immunity from torts or crimes committed during the course of newsgathering. The First Amendment is not a license to trespass.' Similarly, the Second Circuit Court of Appeals in *Galella v. Onassis* (487 F.2d 986, 995-996) stated:

" 'Crimes and torts committed in news gathering are not protected. [Citations omitted.] There is no threat to a free press in requiring its agents to act within the law.'

"Scrutiny of the record demonstrates an adequate basis to justify the compensatory damage award rendered by the jury and, accordingly, such award must stand.

"The trial court in setting aside the jury award of punitive damages, did so because of its exclusion of certain testimony . . . relevant to defendant CBS's motive and purpose in entering the plaintiff's premises unannounced 'with cameras rolling.' . . . Defendant CBS was entitled to demonstrate and explain its motive and the curtailment of this right by the trial court mandates retrial of the punitive damage issue.

"Accordingly, the order . . . which vacated the jury's award of . . . compensatory damages and . . . punitive damages and directed a new trial on the issue of damages, should be modified, on the law, to the extent of reinstating the jury's award of compensatory damages . . . and remanding the matter for a trial on the issue of punitive damages . . . ." (Emphasis added.) 61 App. Div. 2d at 493-495.

The following language from *Dietemann v. Time, Inc.,* 449 F.2d at 250, is relevant to the case before us:

"No interest protected by the First Amendment is adversely affected by permitting damages for intrusion to be enhanced by the fact of later publication of the information that the publisher improperly acquired. Assessing damages for the additional emotional distress suffered by a plaintiff when the wrongfully acquired data are purveyed to the multitude chills intrusive acts. It does not chill freedom of expression guaranteed by the First Amendment. A rule forbidding the use of publication as an ingredient of damages would deny to the injured plaintiff recovery for real harm done to him without any countervailing benefit to the legitimate interest of the public in being informed. The same rule would encourage conduct by news media that grossly offends ordinary men."

We conclude and hold that a party is entitled to recover compensatory damages for injury resulting from publication of information acquired by tortious conduct. A qualification to this rule is that recovery is usually to be against the tortfeasor alone and not against a recipient of the wrongfully acquired information who publishes. See *Pearson v. Dodd,* 410 F.2d 701 (D.C. Cir.), *cert. denied* 395 U.S. 947 (1969). The injured party is entitled to recover punitive damages if the tortious conduct constitutes fraud or a willful, wanton or malicious invasion of the injured party's rights. These rules are in accord with contem-

porary authority and the general rules of Kansas tort law. They implicitly if not expressly underlay the trial of the case at hand.

Plaintiffs argue they were entitled to a directed verdict on the issue of liability. They argue Belluomo's grant of consent was the product or result of misrepresentation by Cottam and Duncan as a matter of law. We have reviewed the record in detail. We have previously noted there was conflicting testimony concerning who said what to whom on July 30. Likewise there were conflicting inferences to be drawn from the evidence concerning defendant's motivation and preparations for the investigative news project. In sum, we find that whether Belluomo's consent was induced by misrepresentation, fraudulent or otherwise, was a jury question and not one to be decided as a matter of law. To further recite evidence presented would serve no sufficiently useful purpose.

Plaintiffs argue the trial court erred in answering a question from the jury during its deliberation.

Plaintiffs submitted the following requested instruction concerning the written consent signed by Belluomo:

"You are instructed that the Court has ruled that the purported consent of Michael Albert Belluomo introduced into evidence as plaintiffs' Exhibit #1 was revocable and was revoked on July 31, 1973, and after such revocation it furnished no license, permission or consent to the defendant to use photographs taken on the plaintiffs' premises on July 30, 1973."

This is an almost verbatim extract from the journal entry covering the pretrial ruling to which reference has been made.

The trial court's instruction No. 10 was:

"You are instructed that the Court has ruled that the purported consent of Michael Albert Belluomo introduced into evidence as Plaintiffs' Exhibit No. 1 was revocable and was revoked on July 31, 1973."

During its deliberation, the jury asked:

"Are we to interpret Instruction 10 to mean that we are to disregard Exhibit No. 1?"

Plaintiffs requested the question be answered:

"[A]fter revocation of Exhibit No. 1 on July 31, 1973, said Exhibit No. 1 furnished no license, permission or consent to the defendant to use photographs or films taken on plaintiffs' premises on July 30, 1973."

This was the language of the requested instruction not included in Instruction No. 10.

After denial of plaintiffs' requested answer, the trial court responded to the jury:

"You are not to disregard Exhibit 1. Exhibit 1 should be considered with all the other exhibits and evidence."

and plaintiffs moved for a mistrial, which was overruled. Assuming error in the trial court response to the jury, we perceive no reason that this was a proper basis for the declaration of a mistrial and none has been suggested.

In our consideration of plaintiffs' argument that the response to the jury question constituted error, we note the following was included in the instructions given:

"You should construe each instruction in the light of and in harmony with the other instructions, and you should apply the instructions as a whole to the evidence."

and Exhibit 1, the writing signed by Belluomo, constituted physical evidence of the consent defendant claimed to have been granted.

We find no error. *Schwartz v. Western Power & Gas Co.,* 208 Kan. 844, 854, 494 P.2d 1113 (1972); *McGlothlin v. Wiles,* 207 Kan. 718, 726, 487 P.2d 533 (1971); *Schroeder v. Richardson,* 196 Kan. 363, 368, 369, 411 P.2d 670 (1966); *Kreh v. Trinkle,* 185 Kan. 329, 342, 343 P.2d 213 (1959). *Cf. Byas v. Dodge City Rendering Co.,* 177 Kan. 337, 342, 343, 279 P.2d 252 (1955); *Shed v. Augustine,* 14 Kan. *282, Syl. ¶ 3 (1875). Response to the jury as requested by plaintiffs would have necessitated even further response to identify consideration that could properly be given the exhibit. The trial court would have been drawn into a discourse of both sides' arguments concerning the validity and effect of the document; that would have been a mistake. Plaintiffs' argument that the requested response to the jury was required, at least in part, because of "the overwhelming and uncontroverted evidence of fraud" begs the question upon our determination that whether there was fraud was for jury determination.

We have discussed defendant's argument that the trial court erroneously determined there was revocation of purported consent and whether the trial court erred in its response to the jury question relating to consent revocation. We have done so because the parties have indicated the questions are of importance. Under the facts of this case and the theory upon which it was submitted

to the jury, tortious trespass in news gathering, revocation is of no importance. If the purported consent was fraudulently induced, there was no consent. If there was consent for defendant's newsmen to be upon the plaintiffs' nonpublic business premises on July 30, later revocation is immaterial. Defendant's exposure to liability to plaintiffs is founded upon the action of its newsmen on July 30.

In its preparation of the subject broadcast, defendant took silent film footage at the restaurant and sound film footage of Moshier at another location a few days later. The sound portion of the latter filming consisted of commentary and questions and answers concerning the restaurant. With immaterial exception, the broadcast was selected parts of both filmings. The audio portion of the broadcast was a combination of parts of the sound track from the second filming and Duncan's purportedly accurate verbal description of the inspection and reiteration of statements made to the news team by Moshier. After preparation of the broadcast material, there remained the unused pieces of both films. These unused pieces of film, out-takes, were randomly spliced and preserved by defendant. They were marked as an exhibit and introduced into evidence by defendant. Plaintiffs complain that it was error to admit the out-takes. Multiple arguments are made.

Plaintiffs say identification of the out-takes by Moshier was necessary to provide proper foundation for their admission. This is incorrect. Duncan testified they were fair representations of what was seen at the restaurant. That was sufficient. *Landrum v. Taylor,* 217 Kan. 113, 120, 535 P.2d 406 (1975); *Howard v. Stoughton,* 199 Kan. 787, 789, 433 P.2d 567 (1967).

Plaintiffs also say admission of the out-takes permitted a mistaken prejudicial conclusion to be drawn by the jury. The conclusion referred to is that the out-takes displayed conditions deserving the award of demerits. It is argued that testimony presented by the plaintiffs refutes that conclusion as well as the propriety of Moshier's conclusions directly and indirectly reported in the broadcast. The issue is immaterial. Recovery of damages did not require falsehood.

There are two further difficulties encountered by plaintiffs' arguments concerning the out-takes. In regard to introduction of the out-takes, plaintiffs at first conceded that those particular

parts showing the conditions "disputed" by plaintiffs' evidence were admissible. Plaintiffs have not identified to the trial court or us the parts not within their concession. On defendant's offer for the admission of the out-takes, plaintiffs lodged a general "irrelevant and immaterial" objection. The objection was insufficient.

Plaintiffs complain of erroneously admitted hearsay and restriction of their examination of Moshier. In the course of Duncan's direct examination by defendant and asserting it was hearsay, plaintiffs objected to the admission of statements of Moshier as testified to by Duncan and as reflected by the out-takes. Moshier's statements were properly admitted hearsay under the rule pronounced in K.S.A. 60-460(a), which provides as an exception to the hearsay rule a previous statement of a declarant present at the hearing and available for cross-examination provided the statement would be admissible if made by the declarant while testifying as a witness. Moshier was present in court. His statements would have been admissible if defendant had called him to testify.

Although Moshier's statements were properly admitted hearsay, the trial court denied plaintiffs leave to call Moshier as a witness at the conclusion of Duncan's testimony. Additionally, it was ruled Moshier was subject to examination by plaintiffs only if called by plaintiffs as a rebuttal witness and, if called, plaintiffs' examination was to be in the nature of direct examination and not cross-examination. Plaintiffs called Moshier in rebuttal. Various questions plaintiffs asked were successfully opposed by defendant on the ground the questions were in the nature of cross-examination. The trial court erred.

When previous statements of a declarant are admitted under K.S.A. 60-460(a) to prove the truth of the matter stated, what occurs is testimony of the declarant out of the mouth of the witness. This testimony of the declarant renders the declarant subject to cross-examination to the same degree as if the declarant had made the statements while testifying as a witness at the hearing. We fail to comprehend how it may be held otherwise, not only as a matter of reason but in view of the language of K.S.A. 60-460(a). The exception applies to statements of declarants "present at the hearing and *available for cross-examination.*" (Emphasis added.)

Is the erroneous restriction of plaintiffs' examination of Moshier reversible error? We hold it is not.

By the jury verdict, it was found plaintiffs were not entitled to recover compensatory damages for trespass. Truth of what was broadcast was no defense to plaintiffs' claim. Moshier's statements that came into evidence second hand were his recorded and nonrecorded statements to defendant's newsmen. The only possible issue for jury decision with regard to which the statements may have been relevant and material was punitive damages. Plaintiffs were not entitled to punitive damages absent entitlement to compensatory damages. In the absence of the finding of liability for compensatory damages, this evidentiary error does not constitute reversible error. See *Patterson v. Burt,* 213 Kan. 463, 467-468, 516 P.2d 975 (1973); *Wood v. Gautier,* 201 Kan. 74, 76-77, 439 P.2d 73 (1968).

We have carefully considered defendant's public record, public interest, newsworthy event or subject, good faith, and absence of malice arguments. They are either irrelevant or immaterial in this case and discussion of them is unnecessary.

We have addressed various issues extraneous to those necessary to our decision so as to assure the parties of our consideration of their various arguments. In essence, we conclude the case was submitted to the jury on a proper legal theory; there was no reversible error; the general verdict resolved all controverted questions of material fact against the plaintiffs (*Essmiller v. Southwestern Bell Tel. Co.,* 215 Kan. 74, 79, 524 P.2d 767 [1974]); and the judgment must be affirmed.

Affirmed.