(591 P.2d 635)
No. 49,529

JACK M. GLEICHENHAUS, *Appellant,* v. BERT C. CARLYLE and
CENTRAL PRESS-PICTORIAL, INC., *Appellees.*

Opinion filed March 9, 1979.

*Fred W. Phelps, Jr.,* of Fred W. Phelps, Chartered, of Topeka, for appellant.

*Jerry R. Palmer,* of Stumbo, Stumbo, Palmer, McCallister & Buening, of Topeka, for appellees.

Before MEYER, P.J., ABBOTT and SPENCER, JJ.

ABBOTT, J.: This is an appeal from an order granting summary judgment in favor of the defendant in a defamation case.

The plaintiff, Jack M. Gleichenhaus, is a Topeka realtor. The defendant Bert C. Carlyle was president of the defendant corporation Central Press-Pictorial Times, Inc., and editor of the corporate-owned newspaper, *The Pictorial-Times.*

On February 27, 1975, Central Press-Pictorial, Inc., published the following in a column written by Bert C. Carlyle entitled "briefs by bert":

"So glad the Mayor chose to divulge his list of campaign contributors so far. It gives all an indication of things to come.

"For instance, his largest contributor was appointed at various times by McCormick last term to do real estate appraisals for the city. His fees for these services totaled $10,950, according to Finance Commissioner Ken Elder.

"Elder said Jack M. Gleichenhaus, who has contributed $300 to McCormick's campaign, received the fees for appraisals, 'and most of the appraisals were thrown out of court and had to be done by other appraisers because they were contested.' "

In his answer, Carlyle admitted publishing the comments and further admitted that he wrote the column and was aware of its contents before publication.

On March 13, 1975, defendants printed a political advertisement that had been paid for by Ken Bueltel, who was McCormick's opponent in the upcoming mayoral election. The ad named five contributors to McCormick's campaign, together with what they allegedly received in return for their contributions. One of the five was Gleichenhaus. The advertisement read in part:

"Jack Gleichenhaus got, in return for his donation to McCormick's campaign; some very nice real estate APPRAISAL CONTRACTS, drawing a total of $10,950 in fees from the city. Many were thrown out by courts."

On the same day, an identical ad which Gleichenhaus claimed the defendants "caused to be published" appeared in the *Topeka State Journal.*

Plaintiff claims that all of the remarks were false. The same position was taken at oral argument. Our review of the record reveals a certified copy of McCormick's campaign contributions along with other evidence to prove the size of the contributions; and plaintiff's counsel stipulated that his client received $10,950 in appraisal fees during McCormick's administration. Nowhere in the record does plaintiff deny making the contributions or receiving the fees. Although the issue before this court does not concern whether the words were defamatory, as this matter is before the court on a summary judgment disposition, the statement in the original column that "most of the appraisals were thrown out of court and had to be done by other appraisers because they were contested," and the conclusion that the appraisal fees were received as a result of the contributions and that many were thrown out by courts are valid allegations of incorrect statements by the defendants.

Considerable difficulty was encountered during discovery. Numerous motions were filed by the parties and acted on by the

trial court concerning interrogatories, requests for production of documents, requests for admissions, pleadings resisting discovery and pleadings to compel discovery and for attorney fees. Defendants ultimately moved for summary judgment and it was granted by the trial judge. In granting summary judgment, the trial judge reaffirmed his earlier finding that plaintiff was a public figure, and further found that even if the facts were taken entirely in plaintiff's favor there was no showing of actual malice sufficient to allow the cause to proceed to trial. Plaintiff perfected his appeal and this court has three issues before it.

1. Did the trial court err when it quashed interrogatories pertaining to twenty-four editorials that did not in any way refer to the plaintiff but which plaintiff alleges indicated a general pattern of defamation and supported an inference of recklessness?

2. Did the trial court err when it found that plaintiff was a "public figure"?

3. Did the trial court err in granting defendant's motion for summary judgment, finding that plaintiff had not shown the existence of actual malice?

The trial court found that where plaintiff is a "public figure," in order to recover he must prove that "actual evil mindedness or specific intent to injure" is directed toward the plaintiff specifically, not toward another person or persons. Thus the trial judge concluded that the information plaintiff sought in his interrogatories was not relevant nor could it conceivably lead to relevant evidence.

Although this court is committed to a policy of liberal discovery, we do not find that the actions of the trial judge constitute reversible error. The thrust of plaintiff's argument is that the editorials, which he admits do not mention or involve him, show a pattern of recklessness in defendants' publication policies generally, and thus would aid him in proving malice in *this* case as well as showing the "motive . . . intent . . . or absence of mistake" (as per K.S.A. 60-455) necessary to prove the specific intent required to establish malice. We do not deem it necessary to determine the merits of plaintiff's legal contentions, for even if the requested information were to be held admissible it would not aid him. If plaintiff is a public figure, the requested information standing alone would not satisfy his burden, as the

other editorials would not show defendants were aware of the likelihood they were circulating false information in the publication which is the subject of this lawsuit. *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412 (1964). Nor would the requested information supply the necessary ingredients to establish reckless conduct. *St. Amant v. Thompson,* 390 U.S. 727, 20 L.Ed.2d 262, 88 S.Ct. 1323 (1968); *Munsell v. Ideal Food Stores,* 208 Kan. 909, 921, 494 P.2d 1063 (1972); *Stice v. Beacon Newspaper Corporation,* 185 Kan. 61, 340 P.2d 396 (1959). None of the requested information deals with plaintiff specifically; thus, it could not lead to admissible evidence that would prove actual malice. Even if we were to determine that some of the requested information might have led to admissible evidence, it would not have furnished the necessary elements plaintiff must prove. Thus, even if we were to determine that the trial court did err in quashing the interrogatories, the error would be harmless.

The next issue deals with plaintiff's status as a public figure. The trial judge determined that plaintiff was a public figure with respect to the matters at issue in this case. This determination was important, for it changed plaintiff's burden of proof from that of proving simple negligence to proving actual malice. See *Gobin v. Globe Publishing Co.,* 216 Kan. 223, 531 P.2d 76 (1975), wherein Supreme Court Commissioner Jerome Harman (subsequently Chief Judge of the Court of Appeals) wrote an excellent review of the development of the qualified privilege which newspapers presently enjoy when the defamed party is a public official.

Even though the article complained of here was primarily directed at a public official (Mayor McCormick) concerning public issues (the mayoral race and the possible expenditure of public money as a reward for political contributions), the publisher of the article is not entitled to qualified privilege unless the plaintiff himself is classified as a public figure. *New York Times Co. v. Sullivan,* 376 U.S. 254; *Gobin v. Globe Publishing Co.,* 216 Kan. at 231-32.

At common law, the only defenses available to a publisher of defamatory material are truth and the various common law privileges, none of which are applicable here. In addition, the First Amendment to the Constitution of the United States was historically held not to affect the law of defamation. However, in 1964

the available defenses were expanded in the *New York Times* case when the United States Supreme Court determined that the defense of truth did not provide adequate protection to the First Amendment rights of the press and held that in state defamation trials *public officials* must establish "malice," which was defined as a known falsity or a reckless disregard for the truth.

In 1967, *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 18 L.Ed.2d 1094, 87 S.Ct. 1975 (1967), extended the constitutional privileges to defamatory criticism of "public figures." There the Supreme Court held that Butts, a prominent athletic director and former football coach, had established himself as a "public figure" by virtue of his position and that Walker, who thrust himself into the "vortex" of an important public controversy, had become a "public figure" insofar as that controversy was concerned.

In *St. Amant v. Thompson,* 390 U.S. at 731, the court stated:

"[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice."

The case further followed *New York Times Co. v. Sullivan,* 376 U.S. 254, and held that the failure to investigate does not in itself establish bad faith.

In 1971 the court further expanded the *New York Times* doctrine to include any person involved in a public controversy, whether or not such a person was a public official or a public figure, so long as the matter was a subject of public or general interest. *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 29 L.Ed.2d 296, 91 S.Ct. 1811 (1971). *Rosenbloom* was the high water mark for the expansion of freedom of the press at the expense of an individual's right to the protection of a good name as protected by the law of defamation. From that point on, the Supreme Court of the United States appears to treat *New York Times Co. v. Sullivan* as a constitutional restriction on the law of defamation rather than an extension of the First Amendment right of freedom of the press.

This retrenchment began when the *Rosenbloom* rationale was rejected in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 347, 41 L.Ed.2d 789, 94 S.Ct. 2997 (1974), wherein the court held that, "so long as they do not impose liability without fault, the States

may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." In *Gobin v. Globe Publishing Co.*, 216 Kan. at 231, Commissioner Harman correctly noted the rules of law announced in *Gertz* to be:

"A publisher or broadcaster of defamatory falsehoods about an individual who is neither a public official nor a public figure may not claim the *New York Times* protection against liability for defamation on the ground the defamatory statements concern an issue of public or general interest; so long as they do not impose liability without fault, the states may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood which injures a private individual and whose substance makes substantial danger to reputation apparent; the states, however, may not permit recovery of presumed or punitive damages when liability is not based on knowledge of falsity or reckless disregard for the truth, and the private defamation plaintiff who establishes liability under a less demanding standard than the *New York Times* test may recover compensation only for actual injury."

In *Gertz,* the court determined that the plaintiff, while an attorney-at-law, was not a public official and that he had achieved no general fame although he had written several books and articles on legal subjects and had long been active in community and professional affairs. The court reasoned that whether a person is a public figure

"may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

". . . We would not lightly assume that a citizen's participation in community and professional affairs rendered him a public figure for all purposes. Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life. It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Gertz v. Robert Welch, Inc.*, 418 U.S. at 351-52.

The United States Supreme Court has since held that a member of a socially prominent family was not a public figure insofar as publication of a divorce proceeding was concerned, although she had held press conferences. *Time, Inc. v. Firestone*, 424 U.S. 448, 47 L.Ed.2d 154, 96 S.Ct. 958 (1976).

We note that the Supreme Court of the United States has

granted certiorari in two cases involving questions of who is a public figure. *Hutchinson v. Proxmire*, 579 F.2d 1027 (7th Cir. 1978), *cert. granted* 47 U.S.L.W. 3463 (U.S. Jan. 9, 1979); *Wolston v. Reader's Digest Ass'n, Inc.*, 578 F.2d 427 (D.C. Cir. 1978), *cert. granted* 47 U.S.L.W. 3463 (U.S. Jan. 9, 1979). In the *Proxmire* case, plaintiff was a recipient of Senator Proxmire's "Golden Fleece" award and was held by the circuit court to be a public figure, insofar as the controversy was concerned, by virtue of his application for and receipt of a government research grant.

All parties here agree that plaintiff is not a public official. The record does not support nor was there a finding made that plaintiff is a public personality for all aspects of his life. If the defendants are entitled to a qualified privilege, it must be on the basis of plaintiff's participation in the particular controversy giving rise to the alleged defamation. Simply stated, the question is whether a substantial contributor to a successful political candidate becomes a "public figure" under the *New York Times* case if that contributor subsequently receives a contract, other than on a competitive bid basis, through either the office of the recipient or some governmental agency over which the recipient exerts considerable influence.

We are not unmindful of a citizen's obligation to support political parties and individual candidates for public office, and hold that one does not become a "public figure" so as to expose himself to increased risk of injury to his good name solely by making a contribution to a political party or candidate. Nor do we hold that one who merely obtains a government contract becomes a public figure *without other factors being present.* The government's need to obtain goods and services of the highest quality at the best price obtainable cannot be best served if those who value their good name must deal with the government subject to the condition of granting the news media a conditional privilege to destroy their good name.

As we view it, however, the ultimate question is whether the news media has a limited privilege to publish and disseminate information concerning government contracts which are awarded by or through the influence of a publicly elected official to a substantial contributor to his campaign. We conclude that it does. One who makes a substantial contribution and then does business with a governmental unit under the influence of the person

to whom he made the substantial contribution puts himself in a special position. Plaintiff did not bid on the contracts. Thus, we hold, plaintiff becomes a "public figure" for the limited purposes of the manner in which he obtained the contract, including the amount and method of contribution, his ability and fitness to perform the contract, the quality and quantity of services performed and goods furnished to fulfill the contract, as well as the amount of fees received. For, as stated in *Hutchinson v. Proxmire,* 579 F.2d at 1034:

"While governmental employees and contractors by their positions alone do not generally have such 'persuasive power and influence that they are deemed public figures for all purposes,' *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974), the nature and extent of an individual's participation in the particular matter may make him a public figure for that issue. *Id.* at 352, 94 S.Ct. 2997."

The position taken in *Hutchinson v. Proxmire* seems at first glance to be inconsistent with the position taken by our Kansas Supreme Court in *Rawlins v. Hutchinson Publishing Co.,* 218 Kan. 295, 543 P.2d 988 (1975), where a city employee (a policeman) was held to be a public official under *Gertz* as opposed to a public figure. *Rawlins* was an "invasion of privacy" case. Rawlins was a uniformed policeman with no special position in the police department. That case does not hold that any government employee is a public official as defined in *New York Times Co. v. Sullivan,* 376 U.S. 254; *Curtis Publishing Co. v. Butts,* 388 U.S. 130; and *Gertz v. Robert Welch, Inc.,* 418 U.S. 323. Rather, it would appear Kansas intended to recognize a police officer's unique position in our society of having the responsibility of enforcing laws and did not intend to hold or imply that all government employees are public officials. In any event, that portion of the holding is immaterial to this case, as Gleichenhaus clearly was not a government employee. We hold that the nature and extent of plaintiff's participation in political activities and the subsequent receipt of a public contract made plaintiff a public figure for the purposes stated herein, and the comments published were covered by a limited privilege.

Plaintiff next contends that the trial court erred in granting summary judgment for defendants under K.S.A. 60-256(c). The trial court correctly followed the well-established rule that in considering a motion for summary judgment, pleadings and documentary evidence must be given a liberal construction in favor

of the party against whom the motion is directed. *Voth v. Chrysler Motor Corporation,* 218 Kan. 644, 545 P.2d 371 (1976). Factual inferences tending to show triable issues must be considered in the light most favorable to the existence of those issues.

"A mere surmise or belief on the part of the trial court, no matter how reasonable, that a party cannot prevail upon a trial will not warrant a summary judgment if there remains a dispute as to a material fact which is not clearly shown to be sham, frivolous, or so unsubstantial that it would be futile to try the case." *Mechtley v. Price,* 217 Kan. 344, 347, 536 P.2d 1385 (1975).

Summary judgment should be employed with caution in defamation cases of this nature. However, the question whether a publication is privileged is a question of law to be decided by the court. *Stone v. Hutchinson Daily News,* 125 Kan. 715, 266 Pac. 78 (1928). The existence of malice is ordinarily a question of fact for the jury, but where the facts are not in dispute, it is a question of law for the court. *Messinger v. Fulton,* 173 Kan. 851, 252 P.2d 904 (1953).

Plaintiff contends that a statement in *St. Amant v. Thompson,* 390 U.S. at 732, that "[t]he finder of fact must determine whether the publication was indeed made in good faith," prevents summary judgment from being entered. When there is a complete lack of evidence, or when the evidence shows no liability as a matter of law, it is the trial court's function to enter summary judgment.

The trial court noted in its findings that although the plaintiff specifically refused to admit that no other evidence existed to prove actual malice than what was before the court, he failed to produce other evidence or file affidavits as authorized by statute. K.S.A. 60-256. Our examination of the record discloses the only affidavit submitted by plaintiff was from Kenneth L. Elder, Finance Commissioner, which admits the published quote is an accurate quote of a comment he made to defendants. While the affidavit does amplify the remarks he made to defendants, he did not deny that he said them. The trial judge found:

"The explanation offered by Elder indicates that the appraisals of Gleichenhaus were largely of no use to the city because the property owners in question refused to accept them, that court action was thereafter necessary and new appraisals were required to accomplish the goals and objectives of the local government. Read in this context, most of the appraisals were done over by other appraisers because they were 'contested' or at least not accepted by property owners and were not used in court. Contrary to constituting affirmative proof that the defendant either knew the falsity of the comment published or had substantial doubt with respect

to its truthfulness the explanation offered by Elder is supportive of defendants' contention that the statement made was truthful. But whether the statement was truthful or untruthful, the issue in the case at bar is whether the affidavit of Elder indicates any proof whatsoever that the defendant entertained either a knowledge of the falsity of the comment published or entertained a substantial doubt concerning its truthfulness. Inasmuch as the Court finds at the threshold that the statements are not inconsistent one cannot serve as proof of the knowledge of the falsity of the other."

The trial court correctly concluded that the issue was not what Elder said to Carlyle, but what effect such statements had on the mind of Carlyle. The record contains no evidence from which a reasonable person could conclude that the defendants acted with actual malice, and the trial judge properly granted summary judgment.

Affirmed.