(684 P.2d 450)

No. 55,387

JAMES P. SELLARS and KELLY SELLARS, *Appellants,* v. STAUFFER COMMUNICATIONS, INC., *Appellee.*

Opinion filed June 28, 1984.

*Timothy A. Short* and *Fred Spigarelli,* of Spigarelli, McLane & Short, of Pittsburg, for the appellant.

*Michael W. Merriam,* of Colmery, McClure, Funk, Letourneau & Entz, of Topeka, for the appellee.

Before PARKS, P.J., ABBOTT and SWINEHART, JJ.

PARKS, J.: This is an appeal by Kelly Sellars from an order granting summary judgment in favor of the defendant, Stauffer Communications, Inc., in a defamation suit.

This action was originally filed by plaintiff Kelly Sellars and her husband, James Sellars, as a result of two articles which

appeared in *The Morning Sun,* a daily newspaper published by defendant in Pittsburg, Kansas. The articles were published October 25 and October 26, 1980, but concerned events which occurred much earlier in January and February of the same year. At that time James Sellars was the Crawford County Sheriff and Kelly Heistand, who married Sellars in February, worked in the sheriff's office as a file clerk. Kelly was employed by the Comprehensive Employment and Training Administration (CETA) and the sheriff had no control over the employment or payment of CETA workers.

The CETA records indicate that Kelly's employment was terminated as of January 18, but because of the scheduling of CETA pay periods and accrual of paid benefit time, she continued to receive county paychecks in February and March. Max McCoy, a reporter for *The Morning Sun,* was perusing "county legals" eight months later when he noticed the disbursal of county funds to Kelly Sellars in February and March. He checked the county records, which incorrectly indicated that Kelly's last day of employment was January 31, 1980, rather than January 18. Since Kelly had been confined in a Missouri jail for two weeks of shock probation beginning January 20, the reporter believed that she had been paid for a period of time when she could not possibly have been working.

McCoy contacted the Topeka CETA office to obtain information concerning the operation of the CETA program and was told to direct specific questions concerning Kelly's status to the local administrator, Linda Smith. McCoy was unable to reach Smith and did not check the official employment records kept at the local CETA office before running the story. The reporter did speak with James Sellars the evening before the first article was published and asked why county records showed Kelly was paid while in jail. Sellars replied that Kelly had been taken off the payroll four days before entering jail and that she may have received payment for vacation or other benefits on her final paycheck.

Shortly before James Sellars lost his bid for reelection as sheriff, *The Morning Sun* ran two articles which included the following statements found by the court to include false information:

1. "Kansas CETA officials are checking payroll records to determine if Sheriff

Jim Sellars misused sheriff's department CETA funds when his wife-to-be was apparently paid for a full month of work last January — although she spent nearly two weeks of that pay period in a Missouri jail." (Article dated October 25, 1980.)

2. "But county records indicate she was paid a full month's wages in January and $298.88 during February." (Article dated October 25, 1980.)

3. "Although Sellars said his wife-to-be was dropped from the sheriff's department CETA payroll in mid-January, county fiscal records show her employment was not terminated until Jan. 31, 11 days after she entered a Missouri jail." (Article dated October 26, 1980.)

The Sellars filed this action for defamation and defendant moved for summary judgment. The district court held that plaintiff James Sellars was a "public official" by virtue of his position as sheriff, and that he would have to prove malice on the part of defendant in order to prevail. The court further held that Kelly Sellars was neither a "public official" nor a "public figure" but, nevertheless, concluded that she also bore the burden of proving malice by defendant. Because the court found no evidence of malice suggested by the record, it granted summary judgment in favor of defendant. Both plaintiffs appealed this decision, but James Sellars died while the case was pending. Since an action for defamation does not survive death (K.S.A. 60-1802), the decedent's name was dismissed from the appeal. Therefore, we are concerned with the propriety of the court's order only as it regards Kelly Sellars (K.S.A. 60-225) and shall consider all of the district court's holdings concerning James' status, insofar as they affect the issues on appeal, as the law of the case.

The district court correctly recognized that publications concerning a public official or public figure are qualifiedly privileged and are actionable only if malice can be shown. New York Times Co. v. Sullivan, 376 U.S. 254, 11 L.Ed.2d 686, 84 S.Ct. 710 (1964); Steere v. Cupp, 226 Kan. 566, 571, 602 P.2d 1267 (1979). If the plaintiff is neither a public official nor a public figure, he need only prove that the defamation was negligently published. Gertz v. Robert Welch, Inc., 418 U.S. 323, 347-48, 41 L.Ed.2d 789, 94 S.Ct. 2997 (1974); Gobin v. Globe Publishing Co., 216 Kan. 223, 231-32, 531 P.2d 76 (1975). The district court held that Kelly Sellars was not a public figure or a public official on her own, but that because of her relationship to a public official and relying on Brewer v. Memphis Pub. Co., Inc., 626 F.2d 1238 (5th

Cir. 1980), the statements published by defendant concerning Kelly were, nonetheless, qualifiedly privileged.

Since the court's decision that both plaintiffs would have to prove malice must be upheld if it is for any reason correct (*Smith v. Stewart,* 233 Kan. 904, 907, 667 P.2d 358 [1983]), we shall first consider whether Kelly, regardless of her relationship to James Sellars, was a public official or public figure. If she does not fall into either of these categories, then we must consider the impact of her status as the spouse of a public official and the holding of the *Brewer* case on the standard of proof she must bear.

A public official is one whose position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all governmental employees. *Rosenblatt v. Baer,* 383 U.S. 75, 86, 15 L.Ed.2d 597, 86 S.Ct. 669 (1966). Kelly Sellars was a CETA employee working in a county office during the events described in the news article. As a file clerk, she exercised no sovereign power or control over the exercise of governmental affairs. See *Steere,* 226 Kan. at 572. Outside of the controversy stirred up by the article, the public would ordinarily have no more interest in her qualifications or activities on the job than it would in any other governmental employee. Therefore, we agree with the district court that plaintiff Kelly Sellars was not a public official.

There are two types of public figures. First, there are those who occupy positions of such persuasive power and influence that they are deemed public figures for all purposes (*Gertz,* 418 U.S. at 345), and secondly, there are persons who are public figures for limited purposes only (*Steere,* 226 Kan. at 572). The all purpose public figure includes those who are "intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 164, 18 L.Ed.2d 1094, 87 S.Ct. 1975, *reh. denied* 389 U.S. 889 (1967) (Warren, C.J., concurring). The limited public figure is one who thrusts himself to the forefront of particular public controversies in order to influence the resolution of the issues involved. *Gertz,* 418 U.S. at 345. The rationale for extending a qualified privilege for publications involving public figures is twofold. First, it is believed that such individuals are less vulnerable to injury

through defamation because their fame provides them with greater access to channels of communication capable of exposing and revealing the falsity of defamatory statements. Second, the court has held that the more important consideration is that public figures are less deserving of protection from defamation because they have voluntarily exposed themselves to the risk of false reporting, in effect, assuming the risk of defamation. *Wolston v. Reader's Digest Assn., Inc.,* 443 U.S. 157, 164, 61 L.Ed.2d 450, 99 S.Ct. 2701 (1979).

Kelly Sellars, as either the wife of the county sheriff or as a file clerk employed by CETA, had no extraordinary fame or power which would have enabled her to shape events of concern to citizens of Crawford County or society at large. She was not a public figure for all purposes. In addition, plaintiff did not thrust herself voluntarily into the vortex of a public controversy to become a limited public figure. *Hanrahan v. Horn,* 232 Kan. 531, 534, 657 P.2d 561 (1983). There was no evidence indicating that plaintiff took part in the campaign "controversy" which may have arisen as a result of the election contest entered by her husband. Additionally, although the newspaper may have created a public furor with its false implication that plaintiff received unearned wages, this is not a "controversy" in the sense intended by *Gertz* and *Hanrahan* because "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson v. Proxmire,* 443 U.S. 111, 135, 61 L.Ed.2d 411, 99 S.Ct. 2675 (1979).

In *Gleichenhaus v. Carlyle,* 226 Kan. 167, 168, 597 P.2d 611 (1979), our Supreme Court agreed with the conclusion of the Court of Appeals concerning the status of the plaintiff as a limited purpose public figure. *Gleichenhaus v. Carlyle,* 3 Kan. App. 2d 146, 152-53, 591 P.2d 635 (1979). The Court stated that a person does not become a public figure solely by making a contribution to a political party or candidate. However, when the contributor subsequently receives a contract, other than on a competitive bid basis, through either the office of the recipient or some governmental agency over which the recipient exerts considerable influence, the Court agreed that the contributor was a public figure for the limited purpose of the issue of political payoffs. *Gleichenhaus,* 226 Kan. at 168. In sum, the

Court took a closer look at the actual power wielded by the plaintiff because of the strong public interest in preventing and exposing political corruption. Since, in fact, the plaintiff occupied a dual status as a political contributor and beneficiary of politically determined contract advantages, the Court extended the protection afforded by the public figure qualified privilege.

The publications in this case also involve a subject of public interest - the use of public funds. However, in *Hutchinson v. Proxmire*, 443 U.S. at 135, the Supreme Court held that a research scientist who received funds from federal agencies was not a public figure simply because his work depended on public funding. Thus, public concern over expenditures and waste in government was not sufficient to make a private plaintiff a public figure.

This case is additionally distinguishable from *Gleichenhaus* because the facts found to be undisputed by the court reveal no possession of hidden power on plaintiff's part which would elevate her to the status of a public figure. The CETA records indicated that plaintiff's employment was terminated on January 18, several days prior to her Missouri incarceration. In addition, even if we assume that plaintiff had influence over her husband-to-be, the undisputed testimony indicates that the sheriff had no control over the disbursal of funds used to pay plaintiff's wages. Therefore, this case lacks the element of power through influence which was determinative in *Gleichenhaus*.

Finally, it should be noted that neither of the reasons underlying the public figure privilege apply to the plaintiff in this case. Kelly Sellars has no greater access to the media or other means of communication than any other private person. Moreover, she took no voluntary steps to place herself in the public limelight. We conclude the plaintiff, Kelly Sellars, was not a public figure.

Having decided that the district court correctly held plaintiff to be neither a public figure nor a public official, we turn now to decide whether the additional factor of her relationship to a public official should alter the burden of proof.

In *Brewer*, 626 F.2d 1238, the case relied on by the district court, the defendant newspaper published an item stating that plaintiff Anita Wood, an entertainer and former girlfriend of Elvis Presley, had met Presley in a Las Vegas hotel for a "reunion." The article also stated that Wood was divorced from

former Ole Miss football star John Brewer. Since, in fact, the Brewers were not divorced and Anita had not visited Presley, both John and Anita Brewer sued for defamation. The Fifth Circuit held that both John and Anita were public figures, at least in certain instances, because of John's career as a professional athlete, and Anita's media exposure as an entertainer and romantic foil for Elvis Presley. Since the article in question concerned an aspect of Anita's life which made her a public figure, *i.e.*, her relationship with Presley, the court concluded that she was a public figure for the purposes of this case and would have to overcome the actual malice burden of proof. The court then concluded that although the news item did not involve the reason for John's fame, he too would have to prove malice to prevail, stating as follows:

"The article does not relate to John's fame as a football player. To hold that he might therefore recover on a showing of negligence would, however, strip the required protection from the press to write such a story about Anita. To summarize, we find that Anita Wood Brewer who had gained media exposure and fame through her career and her romantic relationship with Presley, an extremely well-known entertainer, and whose name continued to appear in stories about Presley after her retirement, was required to prove malice in this suit based on an article that dealt primarily with that romantic relationship and incidentally with her marital status. Since, in our view, the first amendment requires 'malice' protection for the press, which has repeatedly covered both these aspects of her life thereby advancing her career, in publishing this story, the same standard must be applied to John Brewer's suit. Even where the defamatory portions of an article do not relate to the basis for one public figure's fame, he may not, by marrying another public figure, reduce the constitutional protection afforded the press to publish stories about his spouse." *Brewer,* 626 F.2d at 1257-58.

We believe that *Brewer* should not control the outcome of this case. The proper focus of an inquiry into the extent of the constitutional protection for free speech and press in a defamation action should be on the right of the *defamed* person to be free from published falsehoods. *Wolston,* 443 U.S. at 167; *Hutchinson,* 443 U.S. at 135; *Gertz,* 418 U.S. at 345; *Hanrahan,* 232 Kan. at 534. John Brewer, unlike Kelly Sellars, is a public figure for some purposes. Thus, in certain instances a publication concerning Brewer would be privileged. An article about Kelly Sellars, on the other hand, would never be privileged because on her own she is not famous. Therefore, while *Brewer* sought to prevent John from escaping a stricter burden of proof because of

his marriage, the application of *Brewer* to this case would be to use plaintiff's marriage to escalate her burden of proof.

The Fifth Circuit was concerned that the press protection afforded by the qualified privilege to report on Anita's activities would be negated if the privilege did not also apply to the mention of John, himself a sometime public figure. However, the article in question in *Brewer* implies no actual wrongdoing by John but simply errs in identifying his marital status. By contrast, the article published by defendant accused Kelly Sellars of illegal conduct in taking unearned wages just as strongly as it charged her husband, Sheriff Sellars, of participating in that wrongdoing. A defendant should not be able to negligently defame a private person simply by implying that a related public official also participated in the defamatory acts. We believe that to require defendant to act without negligence in publishing statements about Kelly would not lessen the effectiveness of the privilege for reports on James' work as a public official.

We conclude that the district court erred in requiring plaintiff to bear the burden of proving malice on the part of the defendant. Since the district court found that evidence of negligence was shown by the record and defendant did not cross-appeal on this point, the summary judgment is reversed and the case is remanded for trial.

ABBOTT, J., dissenting: Kelly Sellars, in my opinion, is a limited public figure as to the two articles written; and as a matter of law the record does not prove that the statements which are alleged to be defamatory were published with actual malice.

I find it necessary to restate and expand on the facts as set forth in the majority opinion.

The background facts appear to be public knowledge in the area where the defendant's newspaper is circulated, and some of them were subjects of earlier articles in defendant's paper.

James P. Sellars was at all times material the incumbent sheriff of Crawford County, Kansas. At one time the plaintiff Kelly Sellars was a prisoner in the Crawford County jail. At that time her name was Kelly Heistand. She was charged with attempted felony theft and was subsequently placed on two years' probation. Ten days after her release from the Crawford County jail she was hired by Sheriff Sellars and worked under his supervision and control although she was paid with CETA funds. It is correct that her entitlement to vacation and sick pay, and any

other benefits, was determined by CETA, which made the actual payments based on vouchers approved by the Crawford County Board of County Commissioners. While Kelly Heistand was employed by Sheriff Sellars, she obtained a divorce and was restored to her former name of Bratton. The divorce was final in December. She served 14 days in jail from January 20 to February 3, 1980, in Springfield, Missouri, after which she was granted probation. She married Sheriff Sellars in February 1980.

The newspaper reporter discovered the "county legals" for Crawford County payroll records for December 27, 1979, January 31 and February 20, 1980, which, in my opinion, would have led a reasonable person to believe Kelly Heistand Sellars was on the county payroll on those dates. The county fiscal clerk, Joan Westhoff, made an affidavit that Crawford County fiscal records showed Kelly Sellars' employment with Sheriff Sellars was not terminated until January 31, 1980. The reporter *did* contact the local CETA office in an effort to obtain payroll information but was advised the information could not be disclosed. Considerable effort was expended by the reporter before he was finally able to talk with Milford Steele, a CETA official, in the Kansas headquarters in Topeka, and the articles accurately reflect the information he obtained. Milford Steele's comments obviously were based on what the reporter told him. The first article was not run until October 25, 1980, before which at least one attempt was made to contact Kelly Sellars. A number of unsuccessful attempts were made to contact Sheriff Sellars. He was finally contacted at the Sellars' home about 6 o'clock the night before the story ran.

If one views separately the various components of why Kelly Sellars is a limited public figure, one could reach the conclusion that the majority does. But, in my opinion, that cannot be the correct method.

Kelly Sellars was a person convicted of a crime or crimes who at the time was a public employee hired and supervised by her fiancee and paid with special public funds. She was the wife of a public figure when the story was published. She and Sheriff Sellars had a unique love story insofar as how they first met and eventually married. He hired an ex-inmate of his own jail within days after her release from prison who was to be paid with public funds. She had committed a crime in Missouri either before that

time or while working for the sheriff. She was married to him during the time he was Crawford County Sheriff running for reelection in a hotly contested campaign. The story was germane to Sheriff Sellars' fitness for the position. He had hired Kelly Sellars and was her supervisor. Obviously, if she was paid with his knowledge for the time she was incarcerated, it would reflect on his fitness for reelection. Kelly Sellars, of course, would have an interest in his reelection. Considering the totality of the circumstances, I conclude that by virtue of the facts of this case and her marriage to a public figure Kelly Sellars was a limited public figure, and to recover she must prove actual malice. To me, the spouse of a public official must necessarily become a limited public figure to the extent the subject matters of the spouse's activities may be commented upon if those activities reflect on the fitness of a public official to perform the duties of the office held or sought.

It is easy to misconstrue isolated sentences in a story. The entire stories, as they appeared in *The Morning Sun*, are herein reprinted. The first article, titled "Sheriff's CETA funds probe possible," appeared October 25, 1980:

"Kansas CETA officials are checking payroll records to determine if Sheriff Jim Sellars misused sheriff's department CETA funds when his wife-to-be was apparently paid for a full month of work last January—although she spent nearly two weeks of that pay period in a Missouri jail.

"Sheriff Sellars, however, said Friday that Kelly Heistand was taken off the CETA payroll in mid-January, about four days before entering jail. But county records indicate she was paid a full month's wages in January and $298.88 during February.

" 'I'm going to go over this information and discuss it with my coordinator,' Milford Steele Jr., a planning specialist for the Comprehensive Employment and Training Administration in Topeka, said Thursday.

" 'As far as the misuse of funds . . . we could check into the benefits she was supposed to receive as a participant in that agency.'

"Steele said he would discuss the matter with Lois Martin, coordinator of public services, and a decision whether to investigate the matter would likely be made by Tuesday.

" 'I'd have to check the records,' Sellars said, 'but she was very, very definitely taken off the payroll. CETA may have paid her some vacation time or something.'

"Kelly Heistand was hired as a clerk-typist for the sheriff's department Sept. 26, 1979, under Title XI CETA funds.

"On January 16, 1980, she was sentenced to two weeks of 'shock probation' at the Greene County Jail in Springfield, Mo., after pleading guilty in October 1979 to a pending felony theft charge. She was confined to the jail from Jan. 20 to Feb. 3.

"County records show, however, that she was paid $597.76 in January.

"Steele said he would check payroll records to determine if Heistand had any sick leave or vacation time due. At the time of her Missouri 'shock probation' incarceration, Heistand had less than four months logged at the Crawford County Sheriff's Department.

"Sellars probably could not be accused of nepotism in hiring Heistand, Steele said. 'At the time the woman was hired,' Steele said, 'she was not his wife.'

"Sellars confirmed in December 1979, however, that she was living at his rural Girard home.

"Kelly Heistand filed for divorce from her husband, Kenneth Heistand, Sept. 19, 1979, at Crawford County District Court. The divorce was granted Dec. 10, and Sellars married her in Ottawa County, Okla., after applying for a marriage application Feb. 15, 1980.

"Kenneth Heistand, a Missouri prisoner, sent a letter to the Kansas Attorney General's Office alleging his wife received improper and unusual treatment while held at the Crawford County Jail. The letter was dated Sept. 14, 1979.

"Kelly Heistand was arrested at the Pittsburg J.C. Penney's Aug. 21, 1979, and charged at district court with felony attempted theft. She was held at the Crawford County Jail from Aug. 23 until her Sept. 11 conviction. District Judge Don Musser placed her on two years of probation.

"The Pittsburg conviction was unrelated to the pending Missouri charge.

"The Attorney General's Office conducted an 'inquiry' into the improper treatment allegation, but a formal investigation never materialized."

## The second article, titled "Sheriff denies improper use of CETA funds," appeared October 26, 1980:

"Sheriff Jim Sellars Saturday challenged a story in *The Morning Sun* which reported that Kansas CETA officials are checking payroll records to determine if there has been a possible misuse of sheriff's department CETA funds.

"Sellars said that the story was incorrect and a pre-election 'smear.' He said there was a month lag in CETA funds paid to employees and he stood by his story that his wife, the former Kelly Bratton, had never received funds she was not entitled to.

"Although Sellars said his wife-to-be was dropped from the sheriff's department CETA payroll in mid-January, county fiscal records show her employment was not terminated until Jan. 31, 11 days after she entered a Missouri jail.

"Kelly Bratton, formerly Kelly Heistand, was issued a check March 1 for $298.88 for a two-week pay period ending Jan. 31, according to payroll records of the county fiscal office. According to a spokesman for the Greene County Circuit Court in Springfield, however, she was incarcerated at the county jail for 12 days of that pay period, from Jan. 20 to Feb. 3.

"A story in Saturday's edition of *The Morning Sun* incorrectly stated Bratton received a half-month's wages in February. She received the half-month's wages in February. She received the half-month's wages March 1, but for the Jan. 16-31 time period. Although the CETA pay period runs from the 15th of the month to the 15th of the next month, county employees are paid on the first of the month following the pay period.

"County fiscal records show Bratton was paid $298.88, a half-month's wages for

Jan. 16 through Jan. 31, according to Joan Westhoff, county fiscal officer. The majority of Bratton's time during that pay period, according to the Greene County Circuit Court, was spent in jail as part of a 'shock probation.'

"County fiscal records simply record her wages during that time as regular earnings, and do not indicate whether or not vacation time or sick leave was due.

"Heistand, whose maiden name of Bratton was restored when her divorce from Kenneth Heistand was granted Dec. 10, was hired as a clerk-typist for the sheriff's department in late September 1979. She and Sellars were married in February 1980.

"The county commissioners sign sheriff's department CETA payroll claim vouchers, according to County Clerk Dean McFarland. The vouchers are then sent to Independence, Kan., where payroll checks are issued from a Comprehensive Employment and Training Administration account set up for the specific contract, McFarland said."

A mistake or false statement in a newspaper article does not necessarily show malice. There is a significant difference between proof of actual malice and proof of a false or inaccurate statement. Proof of malice is no longer a question of fact for a jury. Trial judges in the first instance, and ultimately appellate judges, must exercise independent judgment and determine whether the record establishes clearly and convincingly that an article was published with actual malice. *Bose Corp. v. Consumers Union of U.S., Inc.,* _____ U.S. _____, 80 L.Ed.2d 502, 104 S.Ct. 1949 (1984). The record in this case does not meet that standard and I would affirm the trial court.