No. 99,139

MELANIE L. VALADEZ, As Administrator of the Estate of ROGER G. VALADEZ, *Appellee/Cross-appellant*, v. EMMIS COMMUNICATIONS and TODD SPESSARD, *Appellants/Cross-appellees*.

(229 P.3d 389)

Opinion filed April 30, 2010.

*Bernard J. Rhodes*, of Lathrop & Gage L.C., of Kansas City, Missouri, argued the cause, and *Melissa Hoag Sherman*, of the same firm, was with him on the briefs for appellants/cross-appellees.

*Craig Shultz*, of Shultz Law Office, P.A., of Wichita, argued the cause, and *Michael Shultz*, of the same firm, was with him on the briefs for appellee/cross-appellant.

The opinion of the court was delivered by

ROSEN, J.: Emmis Communications and Todd Spessard appeal from the jury verdict decided against them in a tort action relating to their news coverage of the arrest of a suspect in the BTK case. Melanie Valadez, the administrator of the Estate of Roger G. Valadez (Estate), cross-appeals from the judgment of the district court limiting the amount and scope of damages.

From 1974 to 1986, a series of at least eight homicides in the Wichita, Kansas, area were linked to an individual who identified himself as BTK (Bind, Torture, Kill). BTK was not identified or captured, the murders apparently ceased, and no further clues surfaced in the case. In the spring of 2004, BTK began to leave messages for the police and write letters to the press, which generated an intensive reinvestigation of the murders. Among these messages from BTK was a package containing autobiographical information. On November 30, 2004, the police released the autobiographical details to the public. These details included a claim that he was born in 1939 and that his father died in World War II. His mother worked near a railroad and his family always lived near a railroad; and he wrote of a lifelong fascination with railroads and trains. He joined the military for active duty and was discharged in 1966, when he moved back in with his mother. The police also speculated, based on the language of BTK's communications, that Spanish might be one of BTK's primary languages.

On December 1, 2004, Wichita police received a confidential tip linking Roger Valadez with BTK. The police arrested Valadez on trespass and housing code violations and executed a warrant to search his residence.

At the time, Todd Spessard was the news director for television station KSN Channel 3 in Wichita. Emmis Communications owned KSN at the time of the events underlying the litigation of this case. KSN has a broadcasting territory that includes cable systems in Oklahoma and Nebraska.

In the early morning of December 2, 2004, Spessard received information that someone had been arrested in connection with the BTK case. Spessard elected to broadcast the story, beginning at 5 that morning. Reporter Chanda Brown went to the address where the arrest was made. Two police cars were present at the scene, and the police informed Brown that they were there for traffic control. In response to further questions, they said they could not comment. The police did not tell her they were following leads in the BTK case. No member of the police force questioned Valadez as a suspect in the BTK killings, and the police took the position that Valadez was never arrested as a suspect in those killings.

KSN devoted a substantial portion of its programming on that day to commentary and interviews relating to the arrest. The news stated that Wichita police had a man in custody whom they were questioning "in connection with the BTK investigation." In the morning broadcast, Chanda Brown identified Roger Valadez and "another woman with the same last name" as the residents of the house where the arrest was made. The broadcast also identified the exact address where the arrest had been made. KSN was the only station in Wichita to identify Valadez by name.

Brown stated that Valadez' home was close to some of the homicide victims and, together with other information, it was adding up that there "could possibly be definitely coincidences with the BTK investigation." The news listed factors, particularly the facts that Valadez lived "very near a railroad track," was of Spanish descent, and was a military veteran, that suggested he was BTK.

KSN interviewed various townspeople for their reaction to the arrest. A married couple who had sold Valadez his home stated that they were surprised because they had no idea that Valadez "was some crazy character." One of the couple was filmed saying, "I felt it run in my mind that he could have grabbed me." The

broadcasts stated that, although the police had not issued any statement confirming that Valadez was BTK, Wichita residents were relieved that Valadez was in custody.

KSN reported that the police chief himself participated in the arrest, suggesting that the arrest was of unusual importance. The police chief was not, in fact, at the scene of the arrest. KSN also reported that Valadez' bond of $25,000 was increasing as the morning progressed, but in fact his bond was reduced to a professional surety bond of $1,250 even before results of a DNA test came back.

By 9 a.m., Spessard had heard a radio report that the police chief had already told an Associated Press reporter that no arrest had been made in the BTK case. The Associated Press put out a report by 11:18 that morning stating that no arrest had been made in the BTK investigation. KSN continued, however, to broadcast reports that BTK might be in custody. These reports included interviews with neighbors and news commentary about "developments in the BTK case." The station also broadcast interviews with people who had driven to Valadez' house specifically to see BTK's home.

Valadez was released on bond later in the day on December 2. KSN continued to air reports suggesting that, even if Valadez was not BTK, he had probably been arrested relating to a homicide. KSN then reported that Valadez "now has to go back to his neighborhood, with his neighbors and all the people that know him, and live with the fact that he was a suspect in a terrible crime." The DNA testing results came back on the afternoon of December 3, clearing Valadez of any criminal activities related to BTK.

BTK continued to leave packages and messages for the press and the police. On February 25, 2005, the police announced that they had taken a person of interest into custody. On February 26, 2005, at a nationally televised press conference, the police announced that they had arrested Dennis L. Rader in connection with the BTK murders. On June 27, 2005, Rader pled guilty to 10 counts of first-degree murder. He was sentenced to 10 consecutive life terms.

On January 10, 2005, Valadez filed a petition naming Emmis Communications, The Associated Press, Journal Communications, Inc., and Journal Broadcast Group of Kansas, Inc., as defendants.

The petition raised claims based on invasion of privacy—intrusion on private concerns; invasion of privacy—publicity to private life; invasion of privacy—false light; outrageous conduct; and defamation. Valadez subsequently voluntarily dismissed his claim against The Associated Press.

On October 20, 2006, a jury found that the defendants' conduct was defamatory as well as extreme and outrageous. The jury awarded damages of $800,000 for mental suffering, shame, and humiliation and $300,000 for injury to reputation.

On January 10, 2007, before a journal entry was settled and signed, the defendants filed a suggestion of death suggesting that Valadez had died on November 27, 2006. The district court granted a motion by Melanie Valadez, acting as administrator of Valadez' estate, to substitute the estate as the plaintiff in the action. It held, however, that the defamation action abated when Valadez died. The court found that the extreme and outrageous conduct action survived Valadez' death. The court reversed the award of $300,000 for damage to reputation because of the abated defamation action and reduced the award of $800,000 to $250,000, citing the K.S.A. 60-19a02 limitation on awards for noneconomic losses.

The defendants filed a timely notice of appeal, and the Estate filed a timely notice of cross-appeal.

We initially address the question of whether the plaintiff proved damages sufficient to sustain an action for outrage.

In Kansas, the tort of outrage is the same as the tort of intentional infliction of emotional distress. *Hallam v. Mercy Health Center of Manhattan, Inc.*, 278 Kan. 339, 340, 97 P.3d 492 (2004).

In order to prevail in a claim of intentionally causing emotional distress, a plaintiff must prove four elements: (1) The conduct of the defendant was intentional or in reckless disregard of the plaintiff; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress was extreme and severe. *Taiwo v. Vu*, 249 Kan. 585, 592, 822 P.2d 1024 (1991) (citing *Roberts v. Saylor*, 230 Kan. 289, 292-93, 637 P.2d 1175 [1981]).

Liability for extreme emotional distress has two threshold requirements which must be met and which the court must, in the first instance, determine: (1) Whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) whether the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it. *Saylor*, 230 Kan. at 292-93.

Conduct that rises to the level of tortious outrage must transcend a certain amount of criticism, rough language, and occasional acts and words that are inconsiderate and unkind. The law will not intervene where someone's feelings merely are hurt. In order to provide a sufficient basis for an action to recover for emotional distress, conduct must be outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society. *Taiwo*, 249 Kan. at 592-93.

Furthermore, conduct that would otherwise be extreme and outrageous may be privileged under the circumstances. "The actor is never liable, for example, where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress." Restatement (Second) of Torts § 46, comment g (1976).

The news media enjoy constitutional protection for reporting true information. See, *e.g.*, *Cohen v. Cowles Media Co.*, 501 U.S. 663, 115 L. Ed. 2d 586, 111 S. Ct. 2513 (1991) (confidential informant cannot maintain defamation action against newspaper that correctly discloses informant's name); *The Florida Star v. B.J.F.*, 491 U.S. 524, 105 L. Ed. 2d 443, 109 S. Ct. 2603 (1989) (statute making it unlawful to publish name of victim of sexual offense violates First Amendment when name lawfully obtained, law specifically targets press, and law imposes liability automatically without case-by-case findings of fact); *Ramsey v. Fox News Network, L.L.C.*, 351 F. Supp. 2d 1145, 1153 (D. Colo. 2005) (because of respect accorded expression in matters of public concern under the First Amendment, such as well-publicized crimes, existence of material fact of false reporting must be established with convincing clarity).

It is likely that Valadez would have suffered some emotional distress if the defendants had limited their broadcast to certain accurate information. For example, if the station had reported only that an anonymous tip had connected Valadez to BTK and that a large contingent of police had then moved in during the night to arrest Valadez and to execute a search warrant on his house, the results would likely have included some degree of public embarrassment and emotional difficulty. It was incumbent on Valadez to demonstrate that he suffered *severe* emotional distress *beyond* what he experienced as a result of the defendants' constitutionally protected activities.

It is only where the distress is "extreme" or "severe" that liability arises. *Taiwo v. Vu*, 249 Kan. 585, 594, 822 P.2d 1024 (1991); Restatement (Second) of Torts § 46, comment j (1976). While Valadez provided testimony that he suffered emotional distress, he failed to present evidence that the distress was extreme.

Valadez testified that, upon seeing the newscast about him, he felt as if he had "been hit in the gut as hard as anybody could hit me and put me on the floor, it wouldn't have been more painful." He testified that he felt physically ill as a result of the publicity and that he was afraid to go back to his home for more than a month. His daughter testified that Valadez was crying when he watched the newscast, that he became more private and more afraid of being alone, and that he broke down in tears when his physician asked him how he was doing. The record does not show that he sought medical treatment or psychological counseling specifically related to the arrest and the concomitant publicity and that the effects were long-lasting. The testimony also does not attempt to separate the anxiety suffered from legitimate, constitutionally protected news reporting from any distress caused by the defendants' alleged unprivileged conduct.

Elevated fright, continuing concern, embarrassment, worry, and nervousness do not by themselves constitute sufficient harm to a plaintiff to warrant the award of damages for outrage. See *Roberts v. Saylor*, 230 Kan. 289, 296, 637 P.2d 1175 (1981); *Vetter v. Morgan*, 22 Kan. App. 2d 1, 4, 913 P.2d 1200, *rev. denied* 257 Kan. 1096 (1995).

As one treatise explained:

"There is no laundry list of what qualifies as the requisite level of severity [of emotional distress] . . . . [I]t is fair to say that headaches, sleeplessness, irritability, anxiety, depression, listlessness, lethargy, intermittent nightmares, and the like would probably not suffice anywhere.

"On the other hand, physical symptoms probably would suffice, and if purely mental symptoms are all that apply . . . those symptoms should at least be long lasting and debilitating." Boston, Kline, & Brown, Emotional Injuries: Law and Practice § 22:7 (1998).

This conclusion is consistent with the determination by this court that the absence of psychiatric or medical treatment, including medication, weighs against a finding of extreme emotional distress. *Saylor*, 230 Kan. at 296.

In the present case, the jury rendered a verdict based on evidence consistent with jury instructions numbers 8 and 10 (based on PIK Civil 3d 127.70 and 127.71). These instructions as given, however, do not fully reflect the threshold requirement for proof of damages necessary for recovery for extreme emotional distress. This discrepancy was brought to the court's attention by the defendant during the court's discussion with counsel preceding the adoption of the jury instructions in this case. While this issue is not before us, we offer this observation for future guidance on cases dealing with this issue.

We find that, as a matter of law, the Estate failed to present sufficient evidence to prove that the injury suffered by Valadez was extreme within the context of this action for outrage. We do not hold that the media is beyond the scope of tortious outrage actions in all circumstances; we merely hold that under the facts of this case the plaintiff failed to prove an injury severe enough to sustain his claim.

This conclusion renders other issues raised by the appellant moot.

On cross-appeal, the Estate asks this court to reverse the district court's ruling setting aside the $300,000 judgment for damage to reputation. The district court determined that the award abated upon the death of the plaintiff. The Estate contends on appeal that the defamation action did not abate because the jury had already

rendered its verdict and the judgment was merely awaiting formal entry.

In *Nicholas v. Nicholas*, 277 Kan. 171, 83 P.3d 214 (2004), this court found that an action for invasion of privacy does not survive the death of the plaintiff. The court found that such an action is personal in nature and must be brought by a living person. 277 Kan. at 191. Defamation is similar to invasion of privacy, in that there is no requirement of proof of personal injury that would allow the action to survive under K.S.A. 60-1801.

K.S.A. 60-1801 reads:

"In addition to the causes of action which survive at common law, causes of action for mesne profits, or for an injury to the person, or to real or personal estate, or for any deceit or fraud, or for death by wrongful act or omission, shall also survive; and the action may be brought notwithstanding the death of the person entitled or liable to the same."

K.S.A. 60-1802 reads:

"No action pending in any court shall abate by the death of either or both the parties thereto, except an action for libel, slander, malicious prosecution, or for a nuisance."

Whether a particular cause of action survives the death of a party is determined by K.S.A. 60-1801. K.S.A. 60-1802 provides only the procedure for the continuation of an action by substitution of parties in those cases where the cause of action survives the death of a party. *Gross v. VanLerberg*, 231 Kan. 401, 405, 646 P.2d 471 (1982).

Proof of invasion of privacy by intrusion on seclusion requires only proof of an intentional interference with the solitude or seclusion of a person's physical being or prying into a person's private affairs and concerns and proof that a reasonable person would be highly offended by the intrusion. See *Werner v. Kliewer*, 238 Kan. 289, 294, 710 P.2d 1250 (1985). These elements are more akin to defamation than to outrage, in that the plaintiff needs only to prove an objective likelihood of offense and does not have to prove actual emotional distress. See *McCormick v. City of Lawrence*, 278 Kan.

797, 806, 104 P.3d 991 (2005) (claims of breach of privacy and outrageous conduct causing severe emotional distress are separate torts).

In *Nicholas*, this court found that an action for invasion of privacy based on intrusion upon seclusion does not survive the death of a plaintiff. The question presented to the court was whether an action for invasion of privacy survives the death of the plaintiff as an "injury to the person" under K.S.A. 60-1801.

The court favorably cited *Carter v. City of Emporia, Kan.*, 543 F. Supp. 354, 356 (D. Kan. 1982), for the proposition that an invasion of privacy action is personal in nature and must be brought by a living person who was the subject of the privacy invasion. 277 Kan. at 191. The court also favorably cited the Restatement (Second) of Torts § 652I (1976), the comments to which stated:

" 'a. The right protected by the action for invasion of privacy is a personal right, peculiar to the individual whose privacy is invaded. The cause of action is not assignable, and it cannot be maintained by other persons such as members of the individual's family, unless their own privacy is invaded along with his. The only exception to this rule involves the appropriation to the defendant's own use of another's name or likeness. [Citation omitted.]

" 'b. In the absence of statute, the action for the invasion of privacy cannot be maintained after the death of the individual whose privacy is invaded. In a few states particular statutes permit the survival of an action for invasion of privacy that has occurred before death. In a smaller number of states there is statutory authorization for an action on the part of surviving relatives for invasion of the privacy of one who is already deceased, with the invasion occurring after his death. Since appropriation of name or likeness is similar to impairment of a property right and involves an aspect of unjust enrichment of the defendants or his estate, survival rights may be held to exist following the death of either party.' " *Nicholas*, 277 Kan. at 191-92.

The court then cited *Mineer v. Williams*, 82 F. Supp. 2d 702 (E.D. Ky. 2000), which rejected an argument that the omission of privacy actions from the list of actions that abate upon a party's death signified a legislative intent to preserve privacy actions: " 'The court holds, however, that there was no need to mention the right of privacy action specifically because one of its essential

elements is that only a living person can sue for invasion of privacy. Restatement of Torts (Second) § 652, supra.' 82 F. Supp. 2d at 705." *Nicholas*, 277 Kan. at 192.

Under the Kansas statutory scheme, an action for damages for injury to reputation does not qualify to survive the death of the plaintiff when the death occurs before judgment becomes final. See *Sellars v. Stauffer Communications, Inc.*, 236 Kan. 697, 695 P.2d 812 (1984) (affirming in its entirety *Sellars v. Stauffer Communications, Inc.*, 9 Kan. App. 2d 573, 575, 684 P.2d 450 [1984], which held that action for defamation does not survive plaintiff's death). We must therefore determine whether judgment was final at the time that the jury reported its verdict.

The law in Kansas is clear that a case is not final until there is no possibility of further court action. The effective date of a journal entry is when it is signed by the trial judge and filed with the clerk of the district court. *ARY Jewelers v. Krigel*, 277 Kan. 464, 473, 85 P.3d 1151 (2004); K.S.A. 60-258. A journal entry containing findings of fact and conclusions of law takes precedence over and may differ from the trial court's oral pronouncement from the bench. *Radke Oil Co. v. Kansas Dept. of Health & Environment*, 23 Kan. App. 2d 774, 782, 936 P.2d 286 (1997). A judgment that has been orally pronounced but that lacks a journal entry is therefore not a final judgment. See *In re Marriage of Wilson*, 245 Kan. 178, 181, 777 P.2d 773 (1989) (in divorce action where party died after divorce was orally granted but before journal entry of judgment was signed by judge and filed with district court clerk, divorce decree was ineffective); see also *State v. Boggs*, 287 Kan. 298, 306, 197 P.3d 441 (2008) (criminal conviction not considered final until availability of appeal exhausted and time for rehearing or final review has passed).

The defamation award was not final at the time that Valadez died, and his estate may therefore not recover damages for injury to his reputation.

The judgment of the district court that the claim for defamation was abated by Valadez' death is affirmed. The award of damages for the tort of outrage is reversed.

DAVID J. KING, District Judge, assigned.